[Crim. No. 22227. Second Dist., Div. Five. June 26, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY ULAS POWELL, Defendant and Appellant.

[Crim. No. 18355. Second Dist., Div. Five. June 26, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
JIMMY LEE SMITH, Defendant and Appellant.

## COUNSEL

Lawrence E. Taylor, under appointment by the Court of Appeal, Irving A. Kanarek and Sheldon Berlin for Defendants and Appellants.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**VOGEL, J.**\*—Appellants were convicted in separate trials of first degree murder. Appellant Gregory Ulas Powell was sentenced to death and appellant Jimmy Lee Smith was sentenced to imprisonment for life. Each conviction has come to this court by way of a separate appeal. However, prior to the trial on the merits appellants were jointly prosecuted and almost all of the pretrial proceedings involved common appearances. Because the case arises from a single incident in which both appellants participated and because a majority of the issues on appeal pertain to joint legal proceedings, we dispose of the appeals in one opinion.

### Facts

There are no substantial disagreements as to the factual background on which the charge against Powell and Smith is predicated. On March 9, 1963, Smith was a passenger and Powell was the driver of a 1946 Ford automobile. They were driving in the Hollywood area of Los Angeles County. Both men were armed.

The Ford automobile was noticed by two Los Angeles police officers, Ian Campbell and Karl Frank Hettinger. The officers were then assigned to a plainclothes detail in an unmarked 1960 Plymouth automobile. They observed that the 1946 Ford did not have an illuminated rear license plate. The police vehicle followed and the officers directed its red spotlight on the rear window of the vehicle occupied by appellants. Both vehicles made a stop on Gower Street. Campbell was the driver of the police vehicle and brought it to a stop an inordinate distance from the curb and directly behind the Ford. Campbell and Hettinger got out of the police vehicle. They approached the Ford. Campbell went to the driver's side and Hettinger approached the passenger's.

When Powell brought the Ford to a stop, Smith removed the hand gun on his person, dropped it to the floor of their automobile and kicked it under the seat.[1] Smith then got out of the Ford and approached Hettinger. Within seconds, Campbell, with Powell behind him, was also moving to the rear of the Ford automobile and approaching Hettinger and the police vehicle. Powell informed Smith and Hettinger that he had "gotten the drop on" Campbell. Campell verified this fact and in-

---

*Assigned by the Chairman of the Judicial Council.

[1]This fact is specifically established in the record of the Smith trial. That appellants had two weapons before they were stopped in Hollywood is implied in the record of the Powell trial.

formed Hettinger that Powell was armed. Powell directed Smith to take Hettinger's weapon. Smith complied. The police officers were ordered into the Ford. Before leaving the area, Smith unsuccessfully attempted to move the police vehicle from its conspicuous position. Smith was unable to release the hand brake of the police vehicle and abandoned his effort to reduce its visibility. Smith returned to the Ford where Campbell was in the driver's seat, Hettinger was behind the front seat on the floorboard and Powell was in the front passenger seat guarding the prisoners. Campbell was ordered to begin driving in the direction of Bakersfield.

During the course of the drive Smith and Powell, located in the front seat, pointed weapons at the police officers and made various threatening statements. Smith and Powell had their own hand guns, the weapons taken from the police officers, as well as the officers' flashlights. Before reaching their ultimate destination Powell inquired as to the amount of cash Campbell and Hettinger had on them. He ordered Hettinger to give him his currency. Powell took it, but later returned it during the course of the drive.

When they arrived in Kern County, and before reaching Bakersfield, Campbell was directed to turn on to a secluded dirt road and to drive out into a field. Finally, he was ordered to bring the vehicle to a stop and all four persons got out. Campbell and Hettinger were standing next to each other with Smith and Powell facing them. Powell then asked Campbell whether he had heard of the "Little Lindbergh Law." Campbell replied affirmatively and Powell raised his gun and shot him in the mouth. Hettinger immediately turned and began to run. He ran down a dirt road, through a fence and into another field. While in flight he turned around and saw three figures: one of them prone, one firing a gun into the prone figure, and the third approaching him. The individual approaching Hettinger fired two shots at him. Hettinger resumed his flight.

Smith and Powell quickly gave chase after Hettinger. Powell took out on foot with a flashlight and Smith took the Ford automobile apparently to use its lights in the search for Hettinger. In the course of this effort Smith and Powell separated.[2]

---

[2]In the separate trail of Powell there was no direct evidence as to what transpired between Smith and Powell after Campbell was first shot and Hettinger fled. Therefore, the jury could not know that Smith took the Ford automobile and left Powell on foot. Unlike Powell, Smith testified in the course of his trial on the merits and provided this information. In both trials, Hettinger testified that he was shot at and chased.

Ultimately, Hettinger found his way to a farm house and made contact with law enforcement authorities, advising them of the events that had transpired. Smith used the automobile to escape from the area, abandoned it near Bakersfield and made his way to a rooming house known as "Mom's Place." It was there that Smith was arrested on March 10 sometime after 10:40 p.m. At that location the arresting officers found a leather jacket and a .38 caliber revolver underneath it. The jacket and revolver were located in the room apparently occupied by Smith. The weapon was identified as the one that was taken from Hettinger.

Powell was arrested during the early morning hours on the day after the homicide by a California Highway Patrol officer approximately 20 miles south of Bakersfield. He was then driving a vehicle that had been reported as stolen.

Further factual background will be given where necessary to explain and resolve the issues raised on appeal.

Appellants were previously tried, convicted of first degree murder and sentenced to death. That conviction was reversed by the California Supreme Court and remanded for retrial. (*People* v. *Powell* (1967) 67 Cal. 2d 32 [59 Cal.Rptr. 817, 429 P.2d 137].) Thereafter, appellants made numerous pretrial motions, including an application for change of venue and to quash the 1968-1 and 1968-2 jury venire. These motions were denied and another trial on the merits commenced against appellants in a joint proceeding. On the motion of Smith, his then trial counsel was discharged and the case was finally severed in order to permit Smith's newly appointed counsel to prepare for trial. For that reason Smith's trial on the merits was delayed to commence after and separate from the trial on the merits as to Powell.

We now turn to the issues raised on appeal designating the same by abbreviated titles and indicating to which appellant each issue pertains.

SMITH AND POWELL

VENUE

■ Appellants argue that the Los Angeles Superior Court was without territorial jurisdiction and that venue was actually in Kern County. Appellants strenuously urge that Penal Code section 790 required that the trial be held in Kern County and that Penal Code section 781[3] is not

---

[3]Penal Code section 781: "When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or

applicable because no element of the offense was accomplished in other than Kern County.

The record plainly shows that the chain of events culminating in the death of Campbell commenced in Los Angeles County where appellants were stopped by the deceased and his partner Hettinger. At that time appellants "got the drop" on the officers, took their weapons, under threat of force compelled Campbell and Hettinger into the Ford automobile and ordered Campbell to drive the group to Bakersfield where Campbell was shot to death. Even if none of the events described prior to the shooting of Campbell constituted any element of the crime charged (Pen. Code, § 187), they were preliminary acts accomplished in Los Angeles County.

In this very case the Supreme Court determined that the "preliminary acts" were sufficient to fix jursidiction in Los Angeles County. (*People* v. *Powell* (1967) 67 Cal.2d 32, 62-63 [59 Cal.Rptr. 817, 429 P.2d 137].) Appellants urge that the Supreme Court's construction is dictum and should not be followed. Whenever the Supreme Court interprets a statute other courts are obliged to follow it. (*People* v. *Hallner* (1954) 43 Cal.2d 715, 720-721 [277 P.2d 393]; *Steelduct Co.* v. *Henger-Seltzer Co.* (1945) 26 Cal.2d 634, 642 [160 P.2d 804].) In holding that Penal Code section 781 was applicable to circumstances where preliminary acts take place in one county and the perpetration of the crime occurs in another, the Supreme Court construed the legislative intent and purpose as broadening jurisdiction beyond rigid limits fixed by the common law. (*People* v. *Williams* (1973) 36 Cal.App.3d 262, 268-269 [111 Cal.Rptr. 378].)

The holding as to jurisdiction in *People* v. *Powell, supra,* is not dictum. Even though it was not necessary for the court to address that issue to accomplish its result, confronting the subject was entirely consistent with the law. (Code Civ. Proc., § 43.) Since the reversal required a new trial it was appropriate to recognize and rule on this issue because it was bound to be a continuing problem: "Independent of the mandate of the code provision, the obligation rests on the court in the efficient and proper administration of the law to determine all questions legitimately submitted by an appeal. Justice so demands and the litigants are entitled to no less." (*King* v. *Kaplan* (1949) 94 Cal.App.2d 697, 700 [211 P.2d 578].) Therefore, jurisdiction was properly fixed in Los Angeles County because it was so determined in the earlier appeal and thereby became the law

---

requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory."

of the case. (*People* v. *Durbin* (1966) 64 Cal.2d 474, 477 [50 Cal. Rptr. 657, 413 P.2d 433]; *People* v. *Harvey* (1958) 156 Cal.App.2d 516, 518-519 [319 P.2d 689].) In *People* v. *Durbin* the court stated: "Questions determined by an intermediate appellate court constitute the law of the case after the decision becomes final. In the absence of exceptional circumstances of hardship and injustice the need for attributing finality to considered judicial determinations compels adherence to the previous decision." (P. 477.) For this same reason, it was not error not to instruct the jury on this issue.

■ Appellants also claim that they were deprived of their Sixth Amendment right to be tried by a jury of the "district wherein the crime shall have been committed," as interpreted in *People* v. *Jones* (1973) 9 Cal.3d 546, 554 [108 Cal.Rptr. 345, 510 P.2d 705]. This claim is distinct from the one decided by the Supreme Court on the previous appeal, which related only to venue. Strictly speaking, the Sixth Amendment right to a "jury of the vicinage" refers to the geographical area from which the jury is summoned rather than to the place of trial, the venue. In practical effect, however, the summoning of a jury from the vicinage usually requires that the venue be, at least in part, coterminous.[4] Thus, in California the requirement of section 198, subdivision 1, of the Code of Civil Procedure, that jurors be one-year residents of the county where they sit, would have made it difficult, to say the least, to have Kern County residents in a Los Angeles venire.

We are, of course, bound by the Supreme Court's interpretation of the vicinage clause of the Sixth Amendment, insofar as it may be relevant to the facts of this case. *Jones* involved charges of selling marijuana. (Health & Saf. Code, § 11531.) According to the proof the offenses were committed entirely within the Central District of the Los Angeles County Superior Court. For certain administrative reasons the case was tried in the southwest district of that court, from which district alone the jurors were drawn. Applying the vicinage clause of the Sixth Amendment in the context of that prosecution, the court held that ". . . the rule quite simply is that a criminal defendant is entitled to a jury drawn from a jury panel which includes jurors residing in the geographic area where the alleged crime occurred."[5] (*Id.* p. 554.)

---

[4]The Judiciary Act of 1789 provided that capital offenses be tried in the county of the crime, unless that could not be done "without great inconvenience." In such a case at least 12 jurors were to be summoned from that county. (1 Stat. 73, 88 (1789). See Blume, *The Place of Trial in Criminal Cases,* 43 Mich.L.Rev. 59, 66.)

[5]In footnote 7 of the *Jones* opinion, the Supreme Court states that its holding applies only to "those defendants who have made an *appropriate* timely challenge to the

At the oral argument of this appeal, the People conceded that the seriousness of their Sixth Amendment problem arises from the following facts:

1. Although California statutory provisions concerning venue were satisfied even if only preliminary acts were accomplished in Los Angeles County, such preliminary acts do not necessarily satisfy the Sixth Amendment test set forth in *People* v. *Jones, supra,* which speaks of juries drawn from the "geographical area where the alleged crime occurred."

2. Although there is a tremendous amount of evidence, direct and circumstantial, that elements of the crime of first degree murder were committed in Los Angeles County, the evidence to that effect is not 100 percent compelling. Thus, if the intention to take Campbell's life was not formed until the party reached Kern County and if the taking of any of the victims' property in Los Angeles County was not accompanied by the required *animus furandi* (cf. *People* v. *Butler* (1967) 65 Cal.2d 569, 573 [55 Cal.Rptr. 511, 421 P.2d 703]), all the actual elements of first degree murder took place in Kern County.

3. The jury was never asked to resolve the conflict in the evidence.

4. Therefore, to rule in favor of the People on appellants' Sixth Amendment point requires us to hold that a jury venire from which Kern County residents were systematically excluded—as, of course, they were by virtue of section 198, subdivision 1, of the Code of Civil Procedure— did not violate the Sixth Amendment under any view of the facts of this case.

We so hold. The factual situation in *Jones* was not even remotely similar to the one at bar, where a Los Angeles kidnaping directly and inexorably led to a Kern County execution, whether or not clemency was still in the cards when the county line was crossed. *Jones* involved three sales of marijuana. Each offense was confined to an intracounty judicial district from which no prospective jurors were drawn. The district where the case was tried and which furnished the entire venire had no connection whatever with the alleged crimes: it merely had an available courtroom. We feel certain that the conviction would not have been set aside on "vicinage" grounds if, for example, Jones had journeyed into the

---

jury panel in the trial court . . . ." (*Id.* p. 556.) (Italics added.)

There is no question that both appellants made an appropriate, timely, Sixth Amendment challenge to a panel drawn entirely from Los Angeles County. Further, it is clear that its reiteration before us is proper in spite of the Supreme Court's opinion on appellants' previous appeal: the Sixth Amendment issue was simply not considered in that proceeding.

southwest district for the specific purpose of procuring the marijuana later sold in the central district.

In *Jones* the Supreme Court was faced with the difficult problem of applying what was originally conceived as a right against the federal government in the context of a state criminal prosecution. After all, we do not have "districts"—the geographical territories mentioned in the Sixth Amendment—nor are we really faced with the evil which appears to have triggered the vicinage clause: the removal of prisoners for trial in England.[6] Clearly, it was not confronted with the issue which we face: whether it is a violation of the Sixth Amendment to confine the summoning of jurors to a geographical area in which every act preliminary to the actual crime was committed, but in which the elements which technically constitute the crime did not occur.

Whatever may be the answer to that question from a constitutional point of view, it is clear that as a practical matter a slavishly literal reading of *Jones*— ". . . area where the alleged *crime* occurred." (*Id.* p. 554.) (Italics added.)—would either nullify the ameliorative provisions of section 781 of the Penal Code as interpreted and applied in *People v. Powell* (1967) 67 Cal.2d 32, 62-63 [59 Cal.Rptr. 817, 429 P.2d 137], or require the importation of jurors from one county into another—a practice in violation of section 198, subdivision 1, of the Code of Civil Procedure.

---

[6]See Heller, The Sixth Amendment (1951) pages 92-93. There seems to be considerable historical evidence that at the time of the adoption of the Sixth Amendment the concepts of vicinage and venue were frequently confused. (See also Blume, *The Place of Trial in Criminal Cases,* 43 Mich.L.Rev. 59, 65-66.) Centuries ago the vicinage concept appears to have developed as a necessary concomitant of the rule that jurors were to decide cases on their own knowledge. (*Id.* pp. 60-61.) That particular rationale for its retention is, of course, no longer valid. Indeed, it is quite difficult to pin down the values which the vicinage concept, considered in isolation, is designed to preserve. Not being a rule of venue, it does not insure a trial near the place where witnesses may be most readily available. Since crimes are often committed far from the accused's county of residence, a jury of the vicinage need not be a jury of one's neighbors. (See *Burton* v. *United States* (1906) 202 U.S. 344, 388 [50 L.Ed. 1057, 1074, 26 S.Ct. 688].) What one is left with is a right to have a jury which represents the offended community. (See *Williams* v. *Florida* (1970) 399 U.S. 78, 100 [26 L.Ed.2d 446, 460, 90 S.Ct. 1893]; cf. *United States* v. *Groner* (5th Cir. 1973) 479 F.2d 577, 582-583.) More realistically—since the right is the accused's—a jury from the vicinage may give the defendant a more sporting chance at "jury nullification" when the community is not offended though, in law, it should be. (See authorities cited in *United States* v. *Dougherty* (1972) 473 F.2d 1113, 1130-1137, 1139-1144 [154 App.D.C. 76].) If the question of prejudice had anything to do with our problem, we very much doubt that any Kern County jury would have nullified the law of murder.

We do not believe that *Jones* compels either result. From a constitutional point of view, the combined effect of the two California code sections is merely that we have divided the State into "districts" as defined in section 781 of the Penal Code, permitting trials to take place in any county which forms part of such a "district";[7] further, we have provided that the jury is to be drawn exclusively from such county of trial, even if only certain preliminary acts take place in such county. If that means that for Sixth Amendment purposes California interprets the word "crime" as including preliminary acts which satisfy the venue requirement of section 781 of the Penal Code, so be it. If we consider that in the federal context Congress is free to redistrict at its pleasure and to define crimes in such a way that defendants can be tried in districts with which they do not have the remotest connection,[8] we are satisfied that no constitutional right of appellants was violated here.

### SMITH AND POWELL
### MATERIAL VARIANCE

■ The information charges in part as follows:

"That the said GREGORY ULAS POWELL and JIMMY LEE SMITH, on or about the 10th day of March, 1963 at and in the County of Los Angeles, State of California, did willfully, unlawfully, feloniously and with malice aforethought murder Ian Campbell, a human being."

Appellants direct our attention to the fact that the mortal wounds were inflicted and the homicide resulted in Kern County, California. This is the predicate to their claim of a material and prejudicial variance between the information filed and the evidence produced at trial. "No accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits." (Pen. Code, § 960.)

■ "The test of the materiality of a variance is whether the indictment or information so fully and correctly informs the defendant of the criminal act with which he is charged that, taking into consideration the proof which is introduced against him, he is not misled in making his

---

[7]A harmless enough practice, when we consider that a federal district may be as large as an entire state.

[8]See, for example, *Johnston* v. *United States* (1956) 351 U.S. 215 [100 L.Ed. 1097, 76 S.Ct. 739]; Abrams, *Conspiracy and Multi-Venue in Federal Criminal Prosecutions: The Crime Committed Formula* (1962) 9 U.C.L.A. L.Rev. 751, 816.

defense . . . ." (*People* v. *LaMarr* (1942) 20 Cal.2d 705, 711 [128 P.2d 345]; Witkin, Cal. Criminal Procedure (1963) § 195, pp. 183-184.)

■ The contention that this variance is prejudicial is specious. Appellants have failed to demonstrate that they were misled in the preparation and conduct of their defense and the evidence heard and considered by the jury. Appellants were previously tried for the same charge. Both had the benefit of a preliminary transcript and a full trial transcript. In no way could they or their counsel have been misled as to the nature of the evidence that the prosecution would offer.

SMITH AND POWELL

CHALLENGE TO JURY VENIRE

Validity of Selection Procedure

■ On August 8, 1968, Smith and Powell made a pretrial motion challenging the entire 1968-1 and 1968-2 jury venires for Los Angeles County. Generally, the challenge was predicated on the contention that the composition of the jury venire did not thoroughly represent a cross-section of identifiable classes of persons within the community. Specifically, appellants asserted that members of minority groups and the lower socio-economic elements were excluded from jury service.

It is important to understand that appellants' primary assault was based upon an attempted showing that the actual number of persons selected for jury service from designated areas was so disproportionate to the expected probable draws that the burden of proving the legality of the venire shifted to the People. The demonstration was premised on the application of a statistical formula designated Chi square. This technique was employed to show whether or not a segment of the community had been chosen for jury service in numbers consistent with a random selection from the general population. In this case, appellants employed the Chi square formula in an effort to show that there was an improbable disparity between the number of certain minorities actually selected for jury service and their numbers in the general population for designated districts. Appellants contend that such disparity implies that a random selection of the jury venire was unlikely.

The evidence offered in support of the motion was profuse, redundant and frequently recondite. It required nearly six months for its production. No useful purpose would be served in making a detailed exposition of this evidence in this opinion. Therefore only pertinent parts will be set forth.

In response to the motion, the People produced evidence outlining the method by which the jury venires were and had been selected in Los Angeles County for the time periods in question. This evidence served as a useful backdrop to an understanding of the issue.

The Los Angeles Superior Court has as a part of its administrative staff a jury commissioner. (Code Civ. Proc., § 204a.) It was his responsibility to provide residents of the county to serve as jurors in cases conducted by the superior court. To implement the execution of this responsibility, the Los Angeles Superior Court adopted as a part of its official rules, rule 25. Selection of jurors.[9] This rule was in effect for the time period relevant to this action. Section 2 thereof has been the primary basis by which the jury commissioner proceeded with the selection of jurors. Following that provision he made his draw three times a year from the registered voters list of Los Angeles County. Specifically, the jury commissioner made an estimate as to the size of the venire that would be required and directed a request to the registrar of voters asking that a certain number of names be selected from specific precincts.

In making the selection from the register of voters the jury commissioner used a key number system, selecting prospective jurors from every sixth precinct and having the registrar of voters draw every fifth name from each of the designated precincts. In order to avoid duplication in the source from which the jurors were drawn, if a precinct had been used in prior years it would be excluded until other precincts had been used.

This process results in two venires per calendar year. The challenge in the present action was addressed to both lists of jurors selected and approved for 1968 and identified as the "1968-1" and "1968-2" venire.

The jury commissioner called for a list of prospective jurors 10 times greater than that needed. This was done in anticipation that for every registered voter that qualified, nine would either not respond, be excused or not qualify.[10] For each of the 1968 venires the jury commissioner expected to need 8,000 qualified jurors. Therefore, he asked that the registrar of voters provide him with approximately 80,000 names. Using data processing to sort the index of registered voters; every fifth name was

[9] Appendix, Exhibit 1.

[10] Approximately 1 percent of those persons to whom a letter is directed do not respond. As to these persons, the jury commissioner takes no action. He deems the expense and inconvenience to exceed the value to be obtained. (See *Adams* v. *Superior Court* (1972) 27 Cal.App.3d 719 at p. 725, fn. 4 [104 Cal.Rptr. 144]; *United States* v. *Hyde* (5th Cir. 1971) 448 F.2d 815 at p. 827.)

drawn from each of the precincts indicated by the jury commissioner in his letter to the registrar. These cards were reproduced for the purpose of addressing letters that were prepared by the jury commissioner and provided to the registrar of voters. Nearly 700 letters were addressed for each one of the 112 mailing days that pertained to each of the venires for a single year. This resulted in an automated random selection.

The letters that were sent to those registered voters whose names were drawn advised them that they had been included on the list of prospective jurors and requested them to appear for an interview on a particular date. On the reverse side were instructions which informed the voter that if he was unable to perform jury duty for certain stipulated reasons he could request an excusal.[11]

Some prospective jurors used the reverse side of the advisory letter requesting exemption or excusal. If it appeared that the excuse was valid and was within the operation of Code of Civil Procedure section 200 or section 201 there was no follow-up. If the written request for excusal did not show on its face that it was within the operation of any statutory basis for exemption or excusal from service, a second request for additional facts was made. The additional information was obtained by way of written communication or by personal interview. If the prospective juror made a personal appearance he completed a personal data sheet and a prospective juror examination. He was then interviewed and the data sheet and the examination were reviewed by one of four interviewers.

At the time of the interview the prospective juror was informed of the rate of compensation and whether or not any of the information contained on the data sheet or otherwise obtained would exempt or excuse him.

Ultimately, the selection process provided a venire of qualified jurors. Their identities were compiled on IBM print-out lists and circulated among the members of the superior court. When a majority of the judges of that court signed the list it became certified.

■ We emphasize that the first step in the selection process is the random withdrawal of names from the list of those who have registered to vote within the county. This approach is unassailable. (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 749-750 [102 Cal.Rptr. 385, 497 P.2d 1121]; *People* v. *Murphy* (1973) 35 Cal.App.3d 905, 918-919 [111 Cal.Rptr. 295]; *People* v. *McDowell* (1972) 27 Cal.App.3d 864, 869-870 [104 Cal.Rptr. 181].) The qualifications to register as a voter are substantially less re-

---

[11]Appendix, Exhibit 2.

strictive than those that pertain to qualifying for jury service. (*Ganz* v. *Justice Court* (1969) 273 Cal.App.2d 612, 623 [78 Cal.Rptr. 348]; cf. *Castro* v. *State of California* (1970) 2 Cal.3d 223 [85 Cal.Rptr. 20, 466 P.2d 244].) Being blind, deaf or decrepit does not operate to disenfranchise the voter. However, those adversities would disqualify one from being a juror. The register of voters probably constitutes the most pervasive listing of qualified citizens from both sexes, all races and all walks of life that is readily available to the government for its jury selection. Its compilation is not the product of those who are charged with the responsibility of selecting the jurors. Most importantly, it identifies citizens who are prima facie eligible to participate as jurors. The government's ability to frustrate voter registration is almost negligible. ▮ Therefore, appellants are prima facie confronted with a jury venire for Los Angeles County, apparently selected at random and in accordance with judicially approved methods. (*United States* v. *Kelly* (2d Cir. 1965) 349 F.2d 720, 777-778, cert. den., 384 U.S. 947 [16 L.Ed.2d 544, 86 S.Ct. 1467].) The burden then fell on them to prove that the procedures followed operated systematically to exclude identifiable segments of the community resulting in a venire that did not fairly reflect a cross-section of the community.

In this case appellants asked that certain comparisons be made of the results of this selection process in four areas selected by appellants. Three of these areas constitute geographically defined districts within census reports prepared by the regional planning commission for the County of Los Angeles. These districts are identified as "Statistical Areas" and given identification numbers by the Regional Planning Commission. They are delineated in the exhibits offered by appellants and entitled "Quarterly Bulletin Population and Dwelling Units." These are generally referred to as "Avalon," "Boyle Heights" and "Watts" Districts. A fourth area was designated and geographically defined by appellants. This area was generally referred to as the "Mulholland District." With respect to all four of the districts, the voter precincts used for the 1968-1 and 1968-2 jury venire were delineated by reference to the official councilmanic district maps obtained through the City Clerk for the City of Los Angeles. These four districts were identified on four exhibits offered by appellants and received into evidence. The precincts were indicated thereon. The Watts and Avalon Districts were selected because they are predominantly populated by members of the black community; the Boyle Heights District was selected because of the fact that it is heavily populated by persons with Spanish surnames; and the Mulholland District was an arbitrary designation of an area that is purported to be populated predominantly by "Caucasians."

The number of precincts included from each of the designated districts for the 1968-1 and 1968-2 jury venires is set forth below:

| | | | | |
|---|---|---|---|---|
| Watts: | 1968-1 | 9; | 1968-2 | 8 |
| Avalon: | 1968-1 | 17; | 1968-2 | 16 |
| Boyle Heights: | 1968-1 | 19; | 1968-2 | 18 |
| Mulholland: | 1968-1 | 16; | 1968-2 | 17 |
| Total precincts | | 61 | | 59 |

In all of Los Angeles County there were at least 7,000 precincts. In the various attacks made by appellants on the selection process for the venire of Los Angeles County the court was asked to apply statistical equations that were predicated on samplings that pertain only to the populations within each of these districts. Essentially, this was an invitation to predict a determination based upon probabilities that were arrived at by comparing each of these districts with the others and with the County as a whole.

In support of the motion appellants called Nancy Ward for the purpose of offering certain demographic information. She was the research director of the Los Angeles County Human Relations Commission. She had conducted statistical analyses based on the McCone Commission's Report to the Governor concerning the 1965 Watts riot. In that connection she spent three years making estimates of large minority population groups within the County of Los Angeles. Based on a variety of computations and formulations, Ward made certain estimates and projections as to the adult population for the designated areas within Los Angeles County and the county as a whole. These estimates and projections purported to produce population information covering the period for the jury selection of the 1968-1 and 1968-2 jury venires.

The source material used by her and upon which her conclusions were dependent included estimates, approximations and projections. Included in the material she referred to were 1960 census tract maps designating home values, family income and population characteristics of blacks. She also referred to the 1950 federal census figures, the 1965 special census report, the Quarterly Bulletin Supplement of Los Angeles County Regional Planning Commission, population data available through the City of Los Angeles and pupil protractions provided to the State Department of Education and pertaining to the County of Los Angeles in particular. Obviously, the conclusions reached by Ward required her to work with a variety of data, none of it really verifiable, and most of it probably not capable of being comparatively related. For example, the population figures of the county and city were in part based on the number of dwellings existing within the identifiable statistical areas. For the purposes of

computing the population, someone had to make an educated guess as to the number of persons residing within each dwelling. The accuracy of that estimation is not demonstrated anywhere in this record. Another example is the substantial variable that must exist with respect to pupil protractions. Obviously, if one is to estimate population based upon the number of students enrolled within any given district, there must be some basic assumption as to family size. Ward used the confidential statistics of the county mental health department to determine what percentage of the population within each district was adult. That statistical information encompasses people under the age of 20 and does not specifically account for persons who are 21 years of age. These statistics, however, were a poor means of arriving at her goal, the adult population, since they classified the population in age groups such as 14 to 19 and 20 to 64. There really was no way of determining what part of the latter group was over 21 and, by the standards of the time, adult.[12] With admirable candor appellants stipulated with the People that all of this witness' computations contained errors. The most basic deficiency in her computations and projections is her total disregard of whether the adults in the sample districts were registered voters. Because the register of voters was the exclusive source for the selection of jury venires—other than the rare nomination by a judge of the court—it was only the registered adult population to which she should have referred for comparison purposes. Thus, her estimates concerning the populations, prospective jury lists and approved jury lists were calculated with reference to a general adult population.[13] The sig-

---

[12]The proceedings predate the adoption of article II, section 1, of the California Constitution added November 7, 1972, lowering the voting age from 21 years of age to 18 years of age.

[13]Her estimates were:

| | District | | Estimated Population | Estimated Prospective Juror List | Estimated Approved Juror List |
|---|---|---|---|---|---|
| 1968-1 | Boyle Heights | | 46,200 | 870 | 82 |
| 4/3/67 | Spanish surname | | 23,300 | 558 | 53 |
| 1968-2 | Boyle Heights | | 46,000 | 901 | 68 |
| 9/25/67 | Spanish surname | | 29,900 | 578 | 44 |
| 1968-1 | Watts | | 12,400 | 230 | 22 |
| 4/3/67 | | Blacks | 10,700 | 205 | 19 |
| 1968-2 | Watts | | 12,200 | 238 | 18 |
| 9/25/67 | | Blacks | 10,700 | 218 | 16 |
| 1968-1 | Avalon | | 25,100 | 476 | 45 |
| 4/3/67 | | Blacks | 24,000 | 451 | 43 |
| 1968-2 | Avalon | | 25,200 | 493 | 37 |
| 9/25/67 | | Blacks | 24,100 | 468 | 35 |
| 1968-1 | Mulholland | | 26,900 | 509 | 48 |
| 4/3/67 | | | | | |
| 1968-2 | Mulholland | | 29,900 | 509 | 40 |
| 9/25/67 | | | | | |

nificance of that error is apparent when it is recognized that these projections constitute one of the factors of the Chi square formula appellants employed to challenge the venire. Her conjectures were based upon ratios comparing the known qualified jury draw for the period in question with the total estimated county adult population at that time. Using that ratio with respect to the number of adult persons that she estimated to populate each of the above districts, she indicated the expected number that would appear on the prospective jury list and the number to be qualified within each of these sample areas. Her disregard of the fact that not all of the adult persons were registered voters makes her conclusions almost irrelevant and certainly not compelling.

Ultimately, appellants demonstrated that the number of qualified jurors selected for the period in question was less than the number estimated by Ward with respect to Avalon, Boyle Heights and Watts. By this demonstration, as will be more expansively discussed, appellants attempted to prove through statistical calculation that the probability of disparity was so great that it must be presumed to be the result of a systematic exclusion of members of the minority community.

It is appropriate to inquire why the particular sample areas were selected. The Los Angeles County 1960 census maps showed that there were several concentrations of minority populations and that the distributions of family income and home values were widely spread. Admittedly, the Los Angeles County 1960 census map entitled *Population Characteristics of Negroes* shows that the concentration within the Avalon and Watts Districts is black. However, the map indicates equivalent distributions in the Pasadena and San Fernando Valley areas. Additionally, it was not shown that this condition had remained static. The record does not reveal that the trial court was provided with evidence that the designated districts constituted a fair sample of the minority groups and the lower socioeconomic segment[14] upon which reliable statistical conclusions could be predicated. It is incumbent upon defendants who challenge the venire to make that showing.

Appellants also called Dr. Wayne Zimmerman to apply the projections of Ward concerning jury selection and composition. He used Ward's esti-

---

[14]Determining who would be included in the "low-socioeconomic" strata is an elusive if not impossible task. It is true that appellants produced 1960 census tracts purporting to show median housing values and income distribution. The witness Ward referred to these in her calculations, but the trial court was not provided with any definition for this category and we can find none in the record. At the very least, it was incumbent upon appellants to define their terms.

mated projections as a part of the statistical analysis about which he testified. Zimmerman holds a Ph.D. in psychology with a major in psychometrics. He classified himself as a "professional test constructor." At the time of the hearing he was the testing officer at California State College at Los Angeles and had experience in the field of determining whether or not tests had been proven as to reliability and validity.

It was stipulated that Zimmerman had been provided with certain IBM print-outs of the 1968-1 and 1968-2 prospective jury lists. This information consisted of, among other things, the actual precinct numbers, the total number of prospective jurors that were contacted, that responded and that qualified for the 1968-2 jury venire for each of the selected districts.

Using this information Zimmerman was cognizant of the actual number of prospective jurors that qualified for the 1968-2 jury venire. He used this as one factor in an equation for the purpose of attempting to demonstrate that the numbers of prospective jurors that qualified from Avalon, Boyle Heights and Watts were numerically deficient. The witness employed the Chi square formula. As mentioned, the formula required two factors for its computation: the observed number of jurors that qualified and the estimated number of jurors that would be expected to qualify as jurors within the designated districts. Zimmerman used the computed conclusions of Ward for the second factor, the expected number of qualified jurors.

In essence, the witness made these computations to produce a Chi square number which could then be referred to a standard table of Chi square values indicating a numerical probability for measuring the degree of expectancy for the actual number of approved jurors. Part of that is best demonstrated by the testimony of Zimmerman as follows:

"Q. BY MR. MAPLE: Does the Chi square calculation that you perform have anything to do with probability?

"A. Yes.

"Q. And what does it have to do with probability, doctor?

"A. A Chi square of this size or any size for that matter would occur by chance a certain number of times; therefore you can interpret a Chi square by indicating its probable occurrence, how many times it might be expected to occur during any given number of times.

"Q. How many times would it be expected to occur by pure chance?

"A. That is correct."

According to Zimmerman the probability of the observed number of prospective jurors that qualified and were selected from each of the designated districts is demonstrated as follows:

| District | Observed Selected Jurors | Probability of Occurrence |
|---|---|---|
| Avalon | 25 | .05 |
| Boyle Heights | 37 | .0003 or .0004 |
| Mulholland | 43 | .6 |
| Watts | 11 | .1 |

Quite obviously appellants are attempting to fashion their argument after the opinion of the United States Supreme Court in *Whitus* v. *Georgia* (1967) 385 U.S. 545 [17 L.Ed.2d 599, 87 S.Ct. 643]. There the Supreme Court was disturbed by a jury selection system operating in Mitchell County, Georgia, which appeared to systematically exclude blacks from grand and petit juries. In Mitchell County blacks constituted 27.1 percent of the tax digest from which jurors were selected. However, blacks constituted only 9.1 percent of the grand jury and 7.8 percent of the petit jury. The Supreme Court believed that this disparity, coupled with the fact that the tax digest was prepared under a segregated system, compelled the conclusion that blacks had been systematically excluded from the grand and petit juries. The important point for our purposes is that the Supreme Court took notice of the "probability" involved in this situation. A specific comment in *Whitus* is as follows:

"While unnecessary to our disposition of the instant case, it is interesting to note the 'probability' involved in the situation before the Court.

"The record does not indicate how many Negroes were actually on the 'revised' jury list of approximately 600 names. One jury commissioner, however, said his best estimate was 25% to 30%, which is in close proximity to the 27.1% who were admittedly on the tax digest for 1964. Assuming that 27% of the list was made up of the names of qualified Negroes, the mathematical probability of having seven Negroes on a venire of 90 is .000006. See Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination Cases, 80 Harv. L. Rev. 338 (1966)." (*Whitus* v. *Georgia, supra,* at p. 552, fn. 2 [17 L.Ed.2d at p. 605].)

The judicial system should pay attention to evidence that shows an

apparent and meaningful disparity between the presence of identifiable segments of the community—racial, economic, ethnic—and their absence from the jury venires. From demonstrated improbabilities courts may infer that the selection system is purposefully or systematically excluding certain segments of the community. (*Adams* v. *Superior Court* (1972) 27 Cal.App.3d 719, 728 [104 Cal.Rptr. 144]; *People* v. *Jones* (1972) 25 Cal.App.3d 776, 782 [102 Cal.Rptr. 277].) The procedural consequence of such a demonstration is to shift the burden of proof to the prosecution to demonstrate a justifiable and rational explanation for the disparity. Whether or not a prima facie case has been made out will turn on whether or not the disparity has been proven and then only if the differential constitutes a number that would probably have an effect on the quintessence of the entire venire.

The problem is that appellants employed a spurious factor in arriving at this Chi square number. Specifically, Ward's estimates were "soft" since they were arrived at without reference to the registered voter population and were otherwise largely speculative. The trial court was not required to accept these statistical conclusions unless it was persuaded that they were founded on substantially reliable data. (Cf. *People* v. *Collins* (1968) 68 Cal.2d 319, 327-328 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176].)

SMITH AND POWELL

CHALLENGE TO JURY VENIRE

Exemptions and Excusals

Appellants challenge the method by which the provisions of Code of Civil Procedure section 201 were administered. In particular, issue is taken with the fact that the jury commissioner, by and with his examiners, has the authority to make a determination as to whether or not a person should be excused when he asserts that service would constitute a hardship or an inconvenience threatening his property or would be adverse to his health or the health and proper care of his family. Rule 25, section 3, authorized the jury commissioner to make this determination. This is consistent with the provisions of Code of Civil Procedure section 201a.[15] It is true that there was no specific criterion as to what

---

[15]Section 201a, Code of Civil Procedure, provides: "In any county or city and county the judge of the superior court or a majority of the judges thereof may adopt written rules and regulations supplementary to such rules as may be adopted by the Judicial Council establishing a procedure whereby the jury commissioner of said county or city and county may be empowered to grant excuses from jury service to such prospective jurors who in the opinion of the jury commissioner qualify for excuses under Section 201."

would constitute a hardship or inconvenience and that the Jury Commissioner's office was provided with no definitive guidelines in that regard. It was admitted that there were no written standards for excusing persons for financial hardship. The variety of personal circumstances necessitated a rather flexible approach. Therefore, the absence of any fixed standard should not be condemned. It appears to us that the Jury Commissioner and his staff attempted to use common sense in determining if a prospective juror should be excused. It is to be noted that being excused on one occasion did not constitute an excuse for all time. Those persons who conducted the interview and had the authority to grant excusals all testified in the course of this trial. We are impressed that their primary motivation was the recruitment of competent jurors. Nothing shows that they applied a different standard with respect to different classes or ethnic groups. While this method is admittedly fluid, it is better that this program be one of recruitment than one of conscription. (*Adams* v. *Superior Court, supra,* at pp. 728-729; *People* v. *Gibbs* (1970) 12 Cal.App.3d 526, 538-539 [90 Cal.Rptr. 866]; cf. *People* v. *Milan* (1973) 9 Cal.3d 185, 195-196 [107 Cal.Rptr. 68, 507 P.2d 956].)

## SMITH AND POWELL
### CHALLENGE TO JURY VENIRE

#### Prospective Juror's Examination

When prospective jurors personally appeared in response to the directive mailed to them, they were requested to fill out a personal data sheet and to complete a prospective juror's examination. A copy of the examination is found in the Appendix.[16] Appellants urge that this examination systematically disqualifies inordinate numbers of racial minorities and the lower socioeconomic members of the community. As a backdrop to this problem, a brief history of the examination should be considered.

About 1935 Dr. Niel D. Warren was invited to prepare an examination at the instance of certain superior court judges. Warren was then professor of psychology at the University of Southern California. Presumably, the preparation of the examination was prompted by a concern to invoke the last two criteria of Code of Civil Procedure section 198:

"§ 198. A person is competent to act as juror if he be: . . . 2. In possession of his natural faculties and of ordinary intelligence and not decrepit; 3. Possessed of sufficient knowledge of the English language."

---

[16]Exhibit 3.

Warren conceded that he did not have a full recollection of all the events that surrounded his preparation of the examination in 1935. He recalled that he discussed the problem with Judge Fletcher Bowron, and made some study of jury instructions. His purpose was to prepare a test designed to permit a jury commissioner to select those persons who would understand the discussions and the instructions of the court during the trial. It was a test of verbal knowledge and was composed of words, "some of which were fairly frequently found in legal proceedings," and others which were simply selected because they would measure verbal knowledge.

As ultimately drafted and employed the examination is in two parts, the first part consisting of a 25-word vocabulary test and the second part consisting of an eight-question reading comprehension examination. Warren recommended a single cutting score. That is, notwithstanding that the examination consisted of two parts, he intended that there be a single score which included a count of the number correct for both parts. He could not recall what that cut-off number was. It was his testimony that the cut-off number established was one to correspond to a certain level of general intelligence with the intention of failing only those who were distinctly below average in intelligence.

In 1967 the examination was administered and graded in two parts. In order to pass the examination it was necessary to obtain 17 correct answers on the first part and 5 correct answers on the second part. This is referred to as the successive cut-off method. The jury commissioner had used this successive cut-off method for all periods of time relevant to this record. When and why the successive cut-off method came into use is obscure. The examination as drafted by Warren continued in use without change except for the order in which the vocabulary words appear and a minor revision in two questions in the second part pertaining to modifications of jury instructions. As of the time of the pretrial motion, no studies had been conducted to determine the validity or reliability of this examination.

Dr. Burton Michael, a professor of education and psychology at the University of Southern California, informed the court that intelligence is an extremely "complex and multifarious" faculty. According to Michael, the ability to comprehend the meaning of words in printed context is a form of intelligence. He examined the juror's qualification examination

and gave the opinion that a person who graduated from high school would be able to pass that test if 60 percent or 70 percent was passing. In general, Michael was of the opinion that differentiations and the ability to pass the test in Los Angeles County were based primarily on educational differences.

Michael testified that there was a differentiation among socioeconomic levels insofar as they can be identified. The most salient observation as to testing in general was the following: "It is found, for example, that people who are of the Latin American race [*sic*] and the Negro race typically, on the average, score somewhat lower on psychological tests than do people of the Anglo-Saxon or Caucasian group. Jewish people do better. Much of this is a function of the amount of education that individuals have had. Frequently, your Negroes and your Latin Americans have not had as much education, even though they may have had as many years; or they have not been associated with schools where a higher level of education is being given. ". . . The longer . . . Negroes have lived in large cities and have been associated with Caucasians and have attended their schools, the higher their I.Q. or intelligence tests are."

His testimony emphasizes that education makes the difference. Michael did not offer an opinion as to whether or not the educational level of the prospective jurors for Los Angeles County was above or below the level of a person who has graduated from high school. He did proffer an opinion as to what one might consider if he undertook the difficult task of designing a test that would be adequate for the purposes of making a determination as to whether or not the criteria of Code of Civil Procedure section 198 had been met. We stress that he would require such a test to determine whether or not a juror could pay attention and whether or not he would be able to handle the vocabulary that is utilized by the lawyers in the courtroom or by the court when it was giving instructions. In other words, this educator and psychologist was not offended by the concept that jurors be qualified to function within the legal milieu.

In addition to rendering an opinion concerning probabilities predicated on the application of the Chi square formula as aforementioned, Zimmerman's testimony was offered with respect to the evaluation of the jury qualification examination. In that regard, Zimmerman testified that he performed an analysis and study of the results demonstrated from certain IBM data print-out information concerning the performance of approved jurors selected at large for the 1968-2 venire and the results obtained by prospective jurors who were examined within each of the sample districts selected by appellants. An independent comparison was made with respect

to the 25-word vocabulary test and the 8-item reading comprehension test. It will be recalled that a passing score on the vocabulary test required 17 correct answers and a passing score on the reading comprehension test required a passing score of 5 correct answers. The product of Zimmerman's analysis is demonstrated below:

| | Vocabulary | | | | Reading | | |
|---|---|---|---|---|---|---|---|
| | ʳtt | Mean | Sigma | N | ʳtt | Mean | Sigma |
| C68 | 64 | 22.0 | 2.5 | 67 | 33 | 7.3 | .9 |
| C66 | 54 | 22.0 | 2.1 | 29 | 23 | 7.1 | .9 |
| C67 | 67 | 22.4 | 2.4 | 364 | 30 | 7.3 | .9 |
| Avalon | 86 | 16.9 | 5.2 | 45 | 54 | 6.3 | 1.5 |
| Boyle Heights | 91 | 18.0 | 5.8 | 76 | 63 | 6.2 | 1.7 |
| Mulholland | 79 | 21.6 | 3.2 | 72 | 56 | 6.8 | 1.4 |
| Watts | 81 | 16.7 | 4.6 | 26 | 49 | 5.8 | 1.6 |

In the first column there is an identification of a selected random group and the four selected districts. The random groups being identified as "C" and then followed by the Arabic numerals 68, 66 and 67, simply to indicate that different keys were used to score the vocabulary examination. The second column, which is designated by an "ʳtt," indicates the reliability score Zimmerman attributed to each of the examinations. In this context, reliability is defined as the dependability or consistency with which the measure will repeat the same result under similar circumstances. The third column indicates the mean average obtained by those examined, and the fourth column, designated by a sigma sign, represents the standard deviation. The numbers that appear in that column were the witness' estimate of the dispersion or frequency of scatter of scores about the mean score. The final column, designated under the letter "N," indicates the number of persons taking the examination.

Obviously, there is a real disparity between the mean score and the standard deviation for the random selected groups and the specific districts upon which appellants focus attention. However, it must be emphasized that this study and analysis did not provide the hard data as to the number of persons passing and the number of persons failing. It does not reflect the same statistical information as was provided to the court in *Carmical v. Craven* (9th Cir. 1971) 457 F.2d 582, 585. Without a doubt, the mean score differentials tend to support appellant's assertion that prospective

jurors from three of the selected districts do not score as well on the jury qualification examination. However, it does not necessarily imply that significant numbers from those selected districts failed the jury qualification examination. The "mean score" is not determinative of the number of persons who received a passing score. It may equally reflect a significant disparity in the scores of those who took the examination. This differential or spread in the scores among the group examined is numerically evaluated by the standard deviation. This analysis is simply not determinative of the percentage of persons who passed or failed. Furthermore, the deficiency noted with respect to the analysis made by Zimmerman in comparing the estimated and obtained jurors from the selected district is also present here. Namely, there was no showing that the sample was sufficient for the purpose of adequately indicating the claimed obstructive nature of the jury qualification examination with respect to minorities and any lower socioeconomic segment of Los Angeles County.

Zimmerman expressed his own opinions concerning both parts of the examination. He testified that the vocabulary section was entitled to a reliability evaluation of .80 and .90; the eight-item reading comprehension section was entitled to a reliability evaluation ranging between .50 and .60. In simple terms, this expressed his opinion that the vocabulary test is of moderate reliability and would be normally acceptable for screening. He characterized the eight-item reading comprehension section as low in terms of reliability and not adequate for screening. In his opinion, the cut-off point of 17 in the 25-word vocabulary test eliminated a large number of people who have had only a grade school education and would eliminate a significant number of people who had not completed high school.

Zimmerman was most critical of the eight-item true-false reading comprehension test. Declaring that it would not be adequate for individual selection, he expressed the opinion that "roughly three-quarters to two-thirds of the variance of the test would be considered to be error by variance." An error by variance is something that would happen by chance alone. Consequently, it could not be a meaningful obstacle to anyone but would constitute only a random and nonselective form of impediment. If the witness' assessment of this part of the examination is correct, its operation would be purely happenstance among all segments of the community. Recalling that five correct answers are required with respect to this part of the examination, it is interesting to note that the mean score for all those tested is above passing and that the standard of deviation is relatively narrow.

Considering that this case involves a challenge to the entire jury venire

for the Central District for Los Angeles County, appellants' application of a statistical analysis is not surprising. A totally empirical study may not be feasible in a countywide analysis of the jury selection system. However, we are impressed with the enormous quantity of factual information that was provided to appellants at their request pursuant to an order of September 24, 1968. This information was supplied through the offices of the jury commissioner, and included the following data for the 1968 venire pertaining to the four selected districts: 1) the total number of persons in the City of Los Angeles who were mailed notices to appear for jury service in the Central District; 2) data processing print-out schedules identifying by name, address, precinct and initial interview date for all such persons; 3) a designation of the number and means of communication from all such persons who responded to the notice to appear for jury service; 4) a designation of all such persons who were excused without examination or personal interview; 5) the total number of persons who took the prospective juror examination and who were excused from service and a tabulation showing whether they passed or failed; 6) the total number of all such persons who responded to the notice to appear for jury service and who were excused after interview with a designation of each of the reasons for excusal.

These data were compiled into four schedules. Each of the schedules represented one of the selected districts. The title of each schedule bears the name of each respective district to which it pertains (Avalon, Boyle Heights, Mulholland and Watts) and the further title "1968-2 Excusals By Precincts." These data were used by Zimmerman in his statistical analysis of the jury qualification examination. It will be recalled that he extracted from them the mean score and standard deviation for each of the prospective jurors tested within the selected districts. On reflection it is curious that appellants did not point to any specific comparative percentages or proportions indicating the pass/fail rate between whites and blacks or any other distinguishable segments in these relatively small areas. Our curiosity is further aroused by the representations in declarations in support of a motion to quash the 1969-1 jury venire for the Central District.

This motion was filed on January 29, 1969. We stress that the motion to challenge the 1968 venire was definitely denied before appellants argued their second motion to quash the later venire approved by the judges of the Superior Court of Los Angeles County. This second motion was denied on January 31, 1969.[17]

---

[17]Although the juries which tried appellants on the merits were drawn from a 1969 venire, the denial of an opportunity to challenge that venire is not claimed to have

In support of this second motion to quash the 1969 venire appellants' offer of proof was less oblique than the approach taken with respect to the first motion. Specifically, appellants offered to prove "that in a white middle-class area of Long Beach, 13% of those taking the test during the 1968 draw failed; that in the largely black area of central Long Beach 48% failed; that in the approximately one-half Mexican-American section of San Pedro 57% failed; and that the combined fail rate in the low income in high percentage Mexican-American areas of San Pedro and Wilmington, was 45%."[18] The offer of proof also included the proffered testimony of appellants' investigator that he had determined by actual observation that only 5 of the 29 persons from the "black community of central Long Beach" were placed on the approved list of jurors. In several other respects this offer of proof in support of the second motion was based on simple percentage comparisons of the pass/fail rate between distinguishable segments of the community. In fact, the offer of proof nearly parallels that made in *People* v. *Jones* (1972) 25 Cal.App.3d 776, 781 [102 Cal.Rptr. 277]. In substance, the offer of proof proposed a demonstration that almost one-half of the black and Mexican-American eligibles in the Long Beach and San Pedro/Wilmington area were excluded from jury service because they failed the juror qualification examination.

This offer of proof illustrates the kind of evidence which was not produced in support of the challenge to the 1968 venires. Having in mind the enormous effort and expense devoted to that challenge, the trial court would have been justified in wondering just why appellants chose not to produce evidence concerning the racial characteristics of the relatively few jurors from the four chosen sample areas who passed and failed the test.

As a matter of fact, appellants' submissions to us do not even summarize

---

been error. If it were, the point would have no merit. Appellants started to present the challenge to the 1968 venires in August, 1968. When their prolix presentation was over on January 29, 1969, the 1968 jurors presumably had been excused. If it were the law that by dragging out the challenge to a particular venire until it becomes moot a defendant is automatically entitled to start again on the next venire, he could avoid going to trial forever.

There is no indication in the record that the procedures challenged with respect to the 1968 venire were changed for the 1969 venire to appellants' detriment. We therefore deem the challenge to the 1968 venires as not having become academic, assuming—as do the parties—that similar selection procedures resulted in similar venire composition.

[18]Note that the districts identified in the offer of proof in support of the second challenge to the venires were not the ones involved in the challenge that was heard.

the pass/fail results from the four test areas, though these results are clearly ascertainable from the exhibits. Realizing that they do not rely on them, we nevertheless think it appropriate to summarize them.

| District | Total Examined | Total Fail | Percentage of Fail | Percentage of Pass |
|---|---|---|---|---|
| Avalon | 84 | 15 | 17 | 83 |
| Boyle Heights | 159 | 22 | 13 | 87 |
| Mulholland | 101 | 7 | 6 | 94 |
| Watts | 39 | 10 | 25 | 75 |

Looking at these figures without the benefit of statistical guidance, it is, of course, apparent that the prospective jurors from the Mulholland District did better on the examination than those from the other three test areas. At the same time, it should be noted that the differences were nothing like those involved in *Carmical* v. *Craven* (9th Cir. 1971) 457 F.2d 582 at page 585, where the fail rate in a predominantly black area was 81.5 percent, while that in a white area was 14.5 percent; nor do the figures reveal as drastic a difference in result as those appellants wanted to produce with respect to prospective Long Beach-San Pedro-Wilmington jurors.

We do not, of course, suggest that satisfactory proof that a juror qualification test which systematically excludes about three times as many blacks as whites is not suspect under certain circumstances. We do, however, point out that even appellants do not argue that their proof takes us that far. In this, they are wise: First, the sample areas are pitifully small compared to the total eligible population; second, we just do not know—though the proof could have been procured—how many of the 25 prospective jurors who failed from the Avalon and Watts areas were actually black or, conversely, how many of the 94 who passed from the Mulholland area were really white; third, no expert statistical evidence which might have overcome these defects was offered. As we said in *Jones*: ". . . raw statistical data without expert interpretation can be extremely misleading." (*People* v. *Jones* (1972) *supra*, 25 Cal.App.3d at p. 786.) Appellants apparently realize that we would not be misled and therefore, it seems, have not attempted to do so.

Notwithstanding the torrential character of the appellants' attack on the jury qualification examination, it is not sufficiently complete or connected to prove that its use in the selection process of jurors actually

resulted in systematic underrepresentation of identifiable groups. The trial court was not bound by the expert testimony produced by appellants, whether or not the People presented contradictory expert evidence. (*People* v. *Gentry* (1968) 257 Cal.App.2d 607, 612 [65 Cal.Rptr. 235].)

## POWELL

### CHALLENGE TO JURY VENIRE

#### Standing to Make Motion

Even though we have considered the motion to quash the jury venire as if both Powell and Smith had standing to make that motion, we have not ignored the contention of the People that Powell has no such standing. (See *People* v. *Sirhan* (1972) 7 Cal.3d 710, 753-754 [102 Cal.Rptr. 385, 497 P.2d 1121].) Powell is not black, as is Smith. However, it is not necessary to address that issue since we have determined that the motion should be denied in any case.

## SMITH AND POWELL

### PLEA OF ONCE IN JEOPARDY

Smith and Powell contend that their prior conviction, reversed by the California Supreme Court, constitutes a perfect defense of double jeopardy and is established as a matter of law. (U.S. Const., Amend. V; Cal. Const. art. I, § 13.)

Appellants included with their respective pleas of not guilty pleas of prior conviction and prior jeopardy. (Pen. Code, § 1016, subds. 4, 5.) The People moved to dismiss these defenses. Appellants counteracted by offering to put in evidence before the jury the entire transcript of the first trial. Additionally, Smith proposed to call all of the jurors who participated in the first trial and many other witnesses. Ultimately, the court ordered the pleas of prior conviction and prior jeopardy stricken.

Smith and Powell contend that the defense of prior jeopardy is valid, resting their conclusion on two premises. The first is that the need for a second trial was the product of deliberate and intentional misconduct on the part of the prosecution. The second has as its core the following proposition: having been convicted of first degree murder and sentenced to death in the first trial, their appeal was mandatory and not initiated by them and consequently cannot be deemed a waiver of the double jeopardy defense.

The California Supreme Court felt compelled to reverse the first trial in this case because it found violations of the *Escobedo-Dorado* rules. Appellants contend that since the reversal was compelled because the People introduced the condemned extrajudicial statements of appellants, there cannot be a retrial. That is not the law. (*People* v. *Demes* (1963) 220 Cal.App.2d 423, 434 [33 Cal.Rptr. 896].) A contrary conclusion might discourage the sharp recognition and correction of reversible error. It seems to us that the prior reversal recognized both the appellate obligation to insure the accused of a fair trial and the People's right to protect themselves against accused criminals. (*United States* v. *Tateo* (1964) 377 U.S. 463, 466 [12 L.Ed.2d 448, 450-451, 84 S.Ct. 1587].)

Appellants' contention that the reversal of the first trial was the product of a mandatory appeal pursuant to Penal Code section 1239, subdivision (b) and thus not the product of any appellate process initiated by them has some superficial plausibility. In general, a defendant's appeal from a judgment of conviction constitutes a waiver of the double jeopardy defense. (1 Witkin, Cal. Crimes (1963) § 215, p. 206.) From this proposition appellants conclude that where the appeal is mandatory and not specifically requested by the defendant, it cannot constitute a waiver. It is true that Penal Code section 1239, subdivision (b) is mandatory and cannot be waived by the defendant. (*People* v. *Stanworth* (1969) 71 Cal.2d 820, 833 [80 Cal.Rptr. 49, 457 P.2d 889].) But the appeal is certainly not detrimental to the defendant. On the contrary, a substantial benefit is afforded by this procedure, both to the accused and to society, when the most severe of all penalties has been imposed. It is not logical that its provisions should operate to the benefit of the accused and to the detriment of society. (Cf. *Gori* v. *United States* (1961) 367 U.S. 364, 366-369 [6 L. Ed.2d 901, 903-905, 81 S.Ct. 1523].) The fallacy of appellants' contention is fully exposed if the alternative is pondered. It is unbelievable that Smith and Powell would have foregone the appellate process and elected to proceed directly to the gas chamber.

These appellants are not the first to urge such sophistry. *People* v. *Quicke* (1969) 71 Cal.2d 502 [78 Cal.Rptr. 683, 455 P.2d 787], is a case in point. *People* v. *Quicke* was an automatic appeal under section 1239, subdivision (b) of the Penal Code. The case had been appealed to the Supreme Court once before.[19] On both occasions the imposition of the death penalty was reversed. One of Quicke's contentions was that he had been placed in prior jeopardy of death at the first penalty trial:

---

[19]The first appeal, *People* v. *Quicke* (1964) 61 Cal.2d 155 [37 Cal.Rptr. 617, 390 P.2d 393], was also an appeal pursuant to Penal Code section 1239, subdivision (b).

"Defendant finally contends that he has been once placed in jeopardy of death because in the absence of errors at the first penalty trial a more favorable result to defendant was reasonably probable. The contention cannot stand; we set aside the judgment in the first penalty trial at the request of defendant. [Citations.]" (*People* v. *Quicke, supra,* p. 524.)

*People* v. *Quicke, supra,* is prima facie authority for the proposition that that mandatory appellate provision pertaining to capital cases does not serve as the predicate for a defense of prior jeopardy.

We conclude that the striking of the pleas of prior conviction and prior jeopardy was not error. At oral argument, respective counsel for each of the appellants conceded that the prosecution's evidence was substantially the same in the second trial as it was in the first. There is nothing to show that there is any factual conflict attending this question. Therefore, the matter was properly determined as a matter of law. (*People* v. *Ramirez* (1972) 27 Cal.App.3d 660, 670 [104 Cal.Rptr. 102].)

### SMITH AND POWELL

#### DENIAL OF HEARING ON MOTION TO DISQUALIFY JUDGE
#### (CODE CIV. PROC. § 170, SUBD. 5)

Each appellant filed a motion to disqualify Judge Thomas W. LeSage. The motions were predicated on an alleged bias, prejudice and incapacity to provide a fair trial to appellants. (Code Civ. Proc., § 170, subd. 5.) Judge LeSage responded by a formal and unequivocal denial. Judge Walter R. Evans was appointed by the Chairman of the Judicial Council to resolve this issue. Judge Evans determined and found that Judge LeSage was not biased or prejudiced in any manner whatsoever against Powell or Smith. Judge Evans decided the motion without a hearing and with reference to the written declarations only. Appellants claim that they were entitled to a hearing. We do not agree. (1 Witkin, Cal. Procedure (2d ed.) § 85, p. 359.) As to Smith, the issue is a red herring in view of the fact that his case was ultimately severed and tried before another judge.

### SMITH AND POWELL

#### EXCUSAL OF JURORS FOR CAUSE
#### BECAUSE OF OPPOSITION TO THE DEATH PENALTY

Powell asserts as error part of the *voir dire* conducted by the court and counsel to determine whether or not members of the jury panel had con-

scientious objections to the imposition of the death penalty so that they could not vote for it notwithstanding what the evidence of the case might be. In substance, the argument is twofold: (1) that the *voir dire* did not, in fact, comply with the requirements of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and (2) that the exclusion of jurors who do entertain such a conscientious bias produced a guilt-oriented jury. Smith asserts the second contention only and does not complain of any particular *voir dire* or excusal.

With respect to both issues we are governed by the holding, adverse to appellants, in *People* v. *Rhinehart* (1973) 9 Cal.3d 139, 155 [107 Cal. Rptr. 34, 507 P.2d 642].

### POWELL

#### SPEEDY TRIAL

■ Powell argues that he has been denied the fundamental constitutional right to a speedy trial. We recognize that this right is afforded to him by article I, section 13 of the California Constitution and the Sixth Amendment to the Constitution of the United States. (*Klopfer* v. *North Carolina* (1967) 386 U.S. 213 [18 L.Ed.2d 1, 87 S.Ct. 988].) Powell stresses that he was originally charged on April 2, 1963, and the selection of a jury for his second trial on the merits did not commence until April 7, 1969. While this time span is striking, it is not the measure of whether or not Powell has been denied his right to a speedy trial as guaranteed by either the federal or state law. We again take notice that the original charge of 1963 resulted in a conviction and an appeal resulting in reversal and remand for trial. (*People* v. *Powell* (1967) 67 Cal.2d 32, 63 [59 Cal.Rptr. 817, 429 P.2d 137].) Accordingly, a remittitur was issued from the Supreme Court and filed with the trial court on September 1, 1967. It is from the date of the filing of the remittitur that the determination concerning speedy trial is measured. (*People* v. *Griffin* (1971) 15 Cal.App.3d 442, 449 [93 Cal.Rptr. 319].)

In *Barker* v. *Wingo* (1972) 407 U.S. 514 [33 L.Ed.2d 101, 92 S.Ct. 2182], the United States Supreme Court turned to the heart of the problem. It recognized the lack of definition in this area and set forth guiding criteria for determining if the federal mandate under the Sixth Amendment is violated:

"A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them

in different ways, we identify four such factors: Length of delay, the reason for delay, the defendant's assertion of his right, and prejudice to the defendant." (*Barker* v. *Wingo, supra,* at p. 530 [33 L.Ed.2d at pp. 116-117].)

Turning to the law of this state, we initially acknowledge that the Legislature has provided a specific measure that is applicable to this case in Penal Code section 1382. Its relevant part reads as follows:

"The court, unless good cause to the contrary is shown, must order the action to be dismissed in the following cases:

". . . . . . . . . . . . . . . . . .

"2. When a defendant is not brought to trial in a superior court within 60 days after . . . the filing of the remittitur in the trial court; except that an action shall not be dismissed under this subdivision if it is set for trial on a date beyond the 60-day period at the request of the defendant or with his consent, express or implied, or because of his neglect or failure to appear and if the defendant is brought to trial on the date so set for trial or within 10 days thereafter."

In the absence of a waiver or showing of good cause Powell was entitled to have his case set on or before October 31, 1967. The trial was originally set for October 17, 1967; well within the time limit.

California's resolution of claims of error predicated on a denial of speedy trial has traditionally turned on whether or not the particular case was a preconviction or post-conviction matter. If the right was violated prior to trial and the limitation of Penal Code section 1382 expired, the defendant's remedy was to move for dismissal. In the absence of a specific waiver or a showing of good cause for delay, the defendant could petition an appellate court with some degree of confidence; but if the statutory time limit was exceeded and the matter went to trial resulting in a conviction, the violation of the constitutional provisions and the Penal Code section noted were looked upon with less benevolence. In these latter instances it was not sufficient to demonstrate that the prosecution had failed to bring the matter to trial within the time provided by law but it was incumbent upon the defendant to demonstrate that the delay had in fact resulted in prejudicial error.

The expansion of the right to a speedy trial in California has fairly paralleled the current progressions of the United States Supreme Court. (*Jones* v. *Superior Court* (1970) 3 Cal.3d 734 [91 Cal.Rptr. 578, 478 P.2d 10].) The most recent and relevant explication of speedy trial in

California is *Sykes* v. *Superior Court* (1973) 9 Cal.3d 83 [106 Cal.Rptr. 786, 507 P.2d 90]. We read the *Sykes* case to require an ad hoc balancing test as formulated in *Barker* v. *Wingo, supra,* when there is a claim of error predicated on a denial of speedy trial in a post-conviction case. (9 Cal.3d at p. 91, fn. 9.)

At the core of Powell's claim of undue delay is the fact that he was relieved of his pro per status and was not allowed to act as his own counsel.[20] Because of this, Powell refused to give his personal consent to any continuances. On September 20, 1967, the Public Defender of Los Angeles County was appointed to represent Powell. Much of the protraction of the case was due to the need of Powell's counsel for continuances. Additional time was consumed in pretrial motions made by the defense. On October 11, 1967, Deputy Public Defender Charles Maple informed the court that Powell's case was assigned to him and that he could not be prepared to provide effective representation at the trial date of October 17, 1967.

---

[20]The following is a chronological history of how Powell came to be represented by counsel:

1) 9/1/67: Remittitur filed: Attorney Kanarek appointed for Smith; proceedings continued to September 6th 2) 9/6/67: Public defender appointed for Powell, cause transferred to Department 100 for appearance on September 8th for trial setting; 3) 9/8/67: Powell moved "to relieve the Public Defender and to appear in propria persona"; motion denied; trial set for October 17, 1967, in Department 103; 4) 9/15/67: On the request of Powell cause was advanced from September 17, 1967, and Powell moved to be permitted to appear in propria persona. The motion was granted and the public defender was relieved; the cause was continued to September 20th for further motions to be made by Powell; 5) 9/20/67: Powell interposed numerous motions pertaining to pro per privileges. Additionally, he moved the court for the appointment of advisory counsel. These motions were made orally and in writing. In support of his motion for advisory counsel, Powell advised the court as follows: that he required help in making contact with "more than twenty witnesses" and that it was necessary to observe their demeanor when interviewed. He acknowledged that he required "the help, support and assistance and professional skills of counsel to render him aid." He importuned the court by declaring "that a fair trial requires that he have the right to appointed counsel to advise him whether to testify; and if he does, to represent him both on direct and on cross-examination"; he conceded that "counsel could give Powell sound advice as to laws and facts, courtroom ethics and, in at-the-bench motions, give the Judge confidence in the grounds urged by the defense; and counsel would aid the Court and Powell in the expeditious conduct of the Court's business"; the court reconsidered the propriety of its earlier ruling to allow Powell to proceed in pro. per. and vacated its earlier order affording that status. The public defender was reappointed to represent Powell; 6) 10/11/67: The matter was advanced on the court's calendar at the instance of Powell and the deputy public defender, Charles Maple, who was assigned to represent Powell. Mr. Maple moved to be relieved as counsel for Powell and Powell joined in the motion and requested that he be permitted to appear in propria persona. These motions were denied. The court made a specific finding that he was not competent to represent himself.

Maple moved for a continuance and explained his client's obdurate unwillingness to consent to any continuance.[21]

The public defender put this problem in its proper perspective by the following statement:

"My own personal feeling, apart from Mr. Powell, is that his right to a speedy trial in that sense is, as I have said, subordinate to his right to a fair trial, and I don't see how he can have his cake and eat it too. I would not want to burden the court with more dialogue on that particular point."

The motion was granted and the matter was continued to December 21, 1967. Thereafter, the trial date was extended on numerous occasions. It is appropriate to recognize that at the time of these motions the law on the right of a defendant to appear in propria persona and without counsel was in a state of confusion and conflict. As this case amply demonstrates, the trial court was confronted with the difficult problem of procedurally navigating this case to avoid the Scylla of delay and the Charybdis of ineffective and inadequate representation.

The record reflects that the protraction was due to legitimate conflicts with Maple's trial calendar or attributable to pretrial motions initiated by appellants. On January 9, 1968, the cause was transferred to Department 78 (Judge Arthur L. Alarcon) for trial to commence on January 22, 1968. On that date the case was called and Powell and Smith moved to sever. The matter was argued and continued to the next day for further pretrial proceedings. On January 23, 1968, Maple informed the court that he

---

[21]Mr. Maple addressed the court as follows:

"MR. MAPLE: Yes. Well, I won't prolong the discussion there, but I have urged upon Mr. Powell that if I should remain his counsel, that I feel that it is in his best interests to waive his right to a speedy trial in the sense that it is speedy within the framework of section 1382 of the Penal Code, the 60-day rule, from the time the remittitur came down; because in fairness to him, and doing justice to his cause, I do not feel that it is possible to go to trial within the 60-day period. It is just physically impossible, and were I even to have assistance from my own office, as Mr. Busch apparently has, and I do not at this point even request that because it isn't a question of having assistance, but it is a question of just getting through the bulk of the materials that have to be gotten through.

"So I have urged upon him that he waive time and permit me to prepare adequately so that he may have a fair trial, my contention being that a fair trial is much to be preferred to a speedy trial; and that certainly if I do not have adequate time to prepare it, he would undoubtedly attack me and my competence later on under the *Ybarra* case and quite readily so for being inadequately prepared.

"So I am on the horns of a dilemma, and I can't accommodate his need for a speedy trial in my desire to properly represent him as counsel; and yet, despite that, Mr. Powell apparently feels that he cannot waive time. I asked him again this morning."

needed a further continuance of 45 to 60 days. The court was informed of the apparent paradox arising from the court's providing Powell with counsel who needed additional time to prepare and Powell's insistence upon strict compliance with Penal Code section 1382. During these proceedings another obstacle was injected into the case. The court vacated the prior appointment of counsel for Smith and appointed in his place another attorney. This aspect of the case became the subject of an independent, celebrated and concurrent appellate review, *Smith* v. *Superior Court* (1968) 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65]. Notwithstanding the appointment of a new attorney for Smith, the case proceeded on several pretrial motions, including the motion to sever, the latter being denied on February 8, 1968. Additional pretrial motions, including a motion to dismiss for lack of jurisdiction, were calendared for February 29, 1968. Furthermore, with the consent of all but Powell, the trial date was continued to April 1, 1968. On February 19, 1968, Smith moved to disqualify the trial judge pursuant to Code of Civil Procedure section 170, subdivision 5. Ultimately, that motion was denied, and on March 14, 1968, Smith invoked Code of Civil Procedure section 170.6. Prior to this time the court had ruled on Powell's pretrial motions to sever and to dismiss and denied both.

As a consequence of the peremptory challenge of March 14, 1968, the matter was returned to the Calendar Department to be reset for trial. The court observed that the discharge of counsel for Smith was before the Supreme Court on a writ of prohibition and was informed that the matter would not be heard until April 12, 1968. In that context, the calendar judge severed the two cases, retaining April 1, 1968, as the trial date for Powell and assigning it to Department 101 (Judge Herbert V. Walker) and continued Smith's trial to May 13, 1968, in Department 105 (Judge Howard H. Schmidt).

On the motion of Powell the matter was advanced from April 1, 1968, to March 27th, at which time Powell's counsel moved for a continuance. He informed the trial court a continuance to April 22, 1968, was necessary in order to implement the psychiatric investigation of the two doctors appointed by the court to assist in Powell's defense. The court inquired as to whether or not Powell personally waived time. The court was informed of the anomaly that Maple deemed the additional time necessary for the preparation of his client's defense but Powell refused to join in the waiver of time.[22] The absurdity was magnified by the fact that at that

---

[22]"It is my position that defendant's right to a speedy trial must be subordinate to his right to a fair trial and if he were forced to trial with counsel that is not prepared, in effect, he would not be represented by counsel at all."

time Powell's case was severed and assigned to a trial department. The trial court granted the motion for continuance and fixed the trial date for April 22, 1968. Having the continuance and reserving his objection, Powell then filed an affidavit of prejudice pursuant to Code of Civil Procedure section 170, subdivision 5. In accordance with the relevant procedures, this issue took priority and was transferred to another judge for determination. On April 3, 1968, Powell's challenge for prejudice was rejected and his case was returned to the trial court. On April 8, 1968, Powell filed a peremptory challenge pursuant to Code of Civil Procedure section 170.6. Consequently, the case was returned to the Calendar Department and Powell's counsel moved to vacate April 22, 1968, as the trial date, indicating that he was engaged in another murder trial. The motion to vacate was granted and the matter was continued to April 26, 1968. Pending pretrial motions for change of venue and dismissal were continued to April 24, 1968, at which time they were denied. Maple again represented that he was still engaged in trial and requested a further continuance. The trial calendar judge set the matter down for May 13, 1968. Coincidentally, Smith's trial was set for the same date.

On May 13, 1968, counsel for Smith was reinstated and Maple informed the court that he was engaged in another trial but anticipated making a further pretrial motion in this case pursuant to Penal Code section 1538.5. On May 21, 1968, Powell's case was on calendar for the purpose of hearing his motion to suppress evidence. On the same calendar was the People's motion to consolidate Powell's case with the case against Smith. On May 22, 1968, the motion to consolidate was granted. The court proceeded with Powell's motion to suppress evidence. Smith joined in that motion. The motion was concluded adversely to Powell and Smith on June 3, 1968. At that time the case was transferred to another trial department, Department 78 (Judge Alfred P. Peracca), for further proceedings on June 6, 1968. The trial was continued to June 10, due to a congested calendar. On June 10, 1968, the matter was called for trial and more pretrial motions were initiated by each of the appellants. These pretrial motions covered a wide variety of subjects, including the right to separate juries, the adequacy of the jail facilities and jail privileges being provided to defendants, prior jeopardy, exhumation of Campbell's corpse, and other matters. On August 8, 1968, Powell and Smith moved to quash the entire 1968-1 and 1968-2 jury venires. The taking of evidence and the argument in support of this motion covered a period of nearly six months and was not concluded until January 29, 1969. Judge Peracca who had entertained all of the pretrial motions from June 10, 1968, to January 31, 1969, including the challenge to the jury venire, withdrew from the case for rea-

sons of poor health. Consequently, the case was transferred to Department 112 (Judge Thomas LeSage) for trial on the merits to be commenced February 3, 1969. When the matter was taken up on February 3, 1969, both appellants interposed more pretrial motions. These continued through February 10, 1969, and on February 13, 1969, prospective jurors were called and *voir dire* commenced on February 19, 1969. From February 19, 1969, to April 1, 1969, the jury selection procedure continued, punctuated from time to time with various motions made by each of the appellants. On April 1, Smith successfully prevailed on the court to discharge his reinstated attorney, Irving Kanarek. This procedural shift compelled the substitution of a new counsel for Smith, required a severance and caused the discharge of the panel of prospective jurors. A separate trial for Powell was then continued to April 7, 1969. At that time a new panel of prospective jurors was sworn and *voir dire* commenced.

Obviously, Powell's claim that he was denied a speedy trial is rooted in his assumption that he had a right to proceed in propria persona. That assumption is not supportable in law. The question of whether or not a defendant had a constitutional right to appear pro se was disposed of in *People* v. *Sharp* (1972) 7 Cal.3d 448 [103 Cal.Rptr. 233, 499 P.2d 489]. In that case the Supreme Court grappled with the practical problem faced by trial courts. Recognizing this dilemma the court indicated that the primary concern must be with overall due process considerations. *Sharp* clearly holds that the right to self-representation is not of constitutional dimension by itself. To the same effect, see *Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930, 934-935 [106 Cal.Rptr. 631, 506 P.2d 1007]. This is not to say that the nearly 20 months between the filing of the remittitur and the commencement of trial does not have the appearance of undue protraction. However, on examination it becomes apparent that the delay in this case is the product of counsel's need to prepare for this complex and difficult murder case and the myriad procedural maneuvers of the defense. The record amply demonstrates that Powell was afforded a highly qualified, competent and imaginative attorney. In providing him with counsel it was incumbent upon the court to nominate an advocate who was thoroughly competent to handle a capital case. Such lawyers are almost continuously in trial and calendar conflicts are not extraordinary. Consequently, the continuances that were granted as a result of Powell's counsel being engaged were with good cause. Furthermore, the record is replete with pretrial motions challenging venue, jurisdiction and challenges to no less than four trial judges. The People cannot be charged with the time consumed in the interest of Powell. At all times the People were prepared to proceed to trial. As we perceive this argument, we are reminded of the

following statement in *People* v. *Floyd* (1970) 1 Cal.3d 694, 707 [83 Cal.Rptr. 608, 464 P.2d 64]:

"Although a criminal defendant may not be deprived of a speedy trial because the prosecution—or the defense—is lazy or indifferent, or because the prosecution seeks to harass the defendant rather than bring him fairly to justice, a criminal defendant may not juggle his constitutional rights in an attempt to evade prosecution. He may not demand a speedy trial and demand adequate representation, and, by the simple expedient of refusing to cooperate with his attorney, force a trial court to choose between the two demands, in the hope that a reviewing court will find that the trial court has made the wrong choice. 'We cannot tolerate such bad faith and we are not constitutionally required to do so. [Citations.]' (*People* v. *Smyers,* 261 Cal.App.2d 690, 700 [68 Cal.Rptr. 194].)"

Powell claims that an additional cause for delay was the fact that the case proceeded jointly against both defendants. Various motions to sever were made by each of the defendants. The presentation, consideration and ruling on these motions contributed to the extension of the trial date. Notwithstanding the fact that the cases were ultimately severed, the court's prior denials of these motions were not error. Joint trials are favored and should not be disavowed on the basis of hindsight only. (*People* v. *Perry* (1925) 195 Cal. 623, 630-633 [234 P. 890].) Statutory policy favors joint trial. (Pen. Code, § 1098.) The circumstances of this case were particularly suited for a joint trial. Appellants were present during all of the activity that constituted the preliminary acts and the elements of the offense charged. (Pen. Code, § 187.) That distinguishes this case from *People* v. *Clark* (1965) 62 Cal.2d 870 [44 Cal.Rptr. 784, 402 P.2d 856], cited by Powell. Furthermore, the People represented that the prosecution would not use any extrajudicial statements and would avoid the conflicts that are delineated in *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. In view of those circumstances, joint proceedings cannot be deemed an unjustifiable cause of delay.

We do not find that the delay was inordinate in light of the complexity of the case, the gravity of the charge and the reasons for the continuances. We do not find that the delay is attributable to the conduct of the People. Finally, we observe that Powell has failed to draw our attention to any fact that demonstrates that any delay resulted in the loss of evidence available to him.

We therefore reject Powell's claim of error based on denial of federal or state constitutional right to speedy trial. The trial court properly denied

the motions for dismissal and could not have based these rulings on any grounds other than those articulated herein.

## SMITH

### PROMPT ARRAIGNMENT

■ The arraignment of Smith following his arrest did not comply with the provisions of Penal Code section 825. It was extended one day beyond the statutory mandate. It is a circumstance that arose prior to the first trial and appeal. In remanding this case for a second trial the Supreme Court implicitly determined the error to have been without irreversible prejudice. (*People* v. *Powell* (1967) 67 Cal.2d 32, 59-60 [59 Cal.Rptr. 817, 429 P.2d 137].) The opinion of the court makes it abundantly clear that it was aware of the delay.

Smith argues that strict compliance with Penal Code section 825 would have afforded his counsel an opportunity to interview Hettinger before the representatives of the People did so. Just how that would have benefited him is not clear. There is nothing in the record that indicates that Hettinger's testimony was contrived. Hettinger was subjected to the test of cross-examination at two trials. That is sufficient.

Smith pursues this issue by implying that Hettinger was not competent to testify at the second trial. Specifically, he claims that an interview with Hettinger after the arrest was essential because his competency to testify became emotionally eroded with the passage of time. During pretrial proceedings, Smith's counsel made reference to a report in his possession from the police department workmen's compensation board. He asserted that the report indicated that Hettinger suffered from an emotional disability because of his experience in the events that underlie this case. Presumably, this information remained available to Smith for whatever value it may have had in challenging the competency of the witness or impeaching his testimony. The record is barren of any evidence that the report of the police department workmen's compensation board would have affected Hettinger's testimony or caused the jury to discount it. In fact, if the jury were informed that Hettinger's mental health had been adversely affected by the events in question, it is more probable that Smith's case would have been prejudiced than enhanced. Admittedly, if the report showed that Hettinger was incompetent and lacked the capacity to testify, that issue would have been taken up out of the presence of the jury. However, the issue was not raised at trial and we have no glimmering as to whether or not it supports the assertions of Smith's

counsel. These egregious allusions to Hettinger's emotional disability—whether or not he had suffered any—are not persuasive.

Appellant's effort to breathe life into this exhausted ground for appeal by claiming that the one-day delay obstructed his efforts to have an early and essential interview with Hettinger is preposterous.

POWELL

### EVIDENCE OF PREVIOUS PAROLE

Powell contends that the introduction into evidence of the fact that he had been previously convicted of a felony, incarcerated in a state penitentiary and subsequently released on parole was error. Basically, the premise for the challenge is twofold. It is contended that the admission of the evidence violated Evidence Code section 1101 and that, in any event, it was highly prejudicial.

The record shows that the presentation of the evidence condemned by Powell was relatively sterile. It amounted to substantially no more than the foundational testimony by an employee of the Department of Corrections for the purpose of authenticating appellant's criminal record in general and the documentation of his parole in particular. This focused the jury's attention on the fact that Powell was on parole and was subject to certain prohibitive conditions, some of which were, without question, violated at the time that Campbell and Hettinger first made contact with appellant. The People's obvious purpose was to show Powell's state of mind to establish the elements required for first degree murder: willful, deliberate and premeditated killing.

Appellant is quite right that the general rule is that evidence of other crimes is inadmissible in connection with the prosecution of another crime. However, the generality is qualified by the provision that the inadmissibility persists only if such evidence is offered to prove a criminal disposition. Evidence Code section 1101, subdivision (b) provides:

"Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts."

Intent is a subject within that category of exceptional facts. The very nature of the charge places state of mind in issue. This particular issue was raised in the remarkably similar case of *People* v. *Durham* (1969)

70 Cal.2d 171 [74 Cal.Rptr. 262, 449 P.2d 198]. The *Durham* case enunciates the rule as follows:

"There is ample authority for the admission of evidence of prior criminal activity when such evidence provides considerable circumstantial proof of the actor's mental state at the time of the charged offense." (P. 188.)

The admission of other crimes is always a sensitive subject. Such unattractive history hardly enhances a defendant's position before the trier of fact. However, where the evidence is material and relevant it is not automatically excluded. The circumstance of Powell's parole status could reasonably tend to prove that he killed Campbell to avoid revocation of his parole and return to prison. Balancing values as to whether or not such evidence should be admitted is left to the discretion of the trial judge. We cannot say that the trial judge did not strike this balance with great care comparing the probative value to the prejudicial effect. In fact, it is apparent to us that such care was exercised and we will not overturn that determination. (*People* v. *Schader* (1969) 71 Cal.2d 761, 772-777 [80 Cal.Rptr. 1, 457 P.2d 841]; *People* v. *Foster* (1974) 36 Cal.App.3d 594, 598-599 [111 Cal.Rptr. 666]; *People* v. *Lynn* (1971) 16 Cal.App.3d 259, 267 [94 Cal.Rptr. 16].)

Powell's parole status was not only relevant to the People's case-in-chief in proving the intent to commit first degree murder, but also to the proffered defense of diminished capacity. As previously observed, the entire circumstance of the killing is germane in determining appellant's state of mind. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal. Rptr. 550, 447 P.2d 942].) Any circumstance that would tend to explain Powell's conduct during this fatal episode may be considered in determining whether or not his criminal conduct is the result of a specific intent or a diminished capacity. Therefore, appellant's position as a parole violator with captured law enforcement officers on his hands is a relational circumstance that the jury could properly consider and weigh.[23]

---

[23]The jury was instructed that the evidence of appellant's prior criminal record was to be considered for the limited purpose of showing motive and as the basis for the testimony of the psychiatrist called by Powell:

"Evidence was offered in this case for the purpose of showing that the defendant, Gregory Ulas Powell, was on parole on March 9 and 10, 1963, and that Jimmie Lee Smith was also on parole. Sugh [*sic*] evidence was received for a limited purpose only and is to be considered by you only for the limited purpose hereinafter stated and for no other purpose.

"The relevancy, if any, of such evidence depends on whether or not in your judgment it tends to show that they had a motive for the commission of the offense charged against the defendant in this action.

"You are not permitted to consider such evidence for any other purpose and as to

POWELL

SEARCH AND SEIZURE

Powell's first contact with law enforcement authorities following the shooting of Campbell and the escape of Hettinger occurred during the early morning hours of the following day, March 10, 1963. At this time he was operating a 1957 Plymouth Belvedere automobile colored white over red. The automobile was owned by William Riddick. Around midnight after the murder, Mr. Riddick discovered that his automobile was missing and reported that fact to the Kern County Sheriff's office. The sheriff dispatched an officer to the Riddick residence and a report was given which included a description of the automobile and its license plate number, California EOB 940.

During this time period a California Highway Patrol black and white vehicle was operated by Traffic Officer Billy J. Odom, accompanied by a fellow officer, Mervyn Crist. Prior to learning of the theft of the Plymouth automobile or its association with the homicide, Odom was aware of an all-points bulletin relating to a homicide of a police officer. Thereafter, at 12:40 a.m., Odom and Crist received a radio broadcast reporting the theft of the 1957 Plymouth Belvedere and describing its distinctive identifying marks. Shortly after 1 a.m. they received another radio broadcast reporting that a Los Angeles police officer had been involved in a homicide and that a white-over-red 1957 Plymouth Belvedere automobile had been stolen and that it was believed to be occupied by the persons suspected of committing the homicide. The report advised the officers of the description of the automobile as to its color and license plate number. Upon receiving this last item of information these officers left their assigned beat and drove to a location on Freeway 99 to try and apprehend the suspects of the stolen vehicle. While on Freeway 99

that purpose you must weigh such evidence in the same manner as all other evidence in the case. You are specifically instructed that since such evidence was received for the foregoing limited purpose only, you are not to consider such evidence as proving or tending to prove other distinct offenses, continued criminality or a criminal disposition. As stated, you are to consider such evidence solely as it may bear upon the above stated issue of motive."

"You are instructed further that defendant's Exhibit POWJ consisting of certain records of the United States Department of Justice, Bureau of Prisons, transmitted by the Director by letter dated July 18, 1963, and defense's Exhibit POWN, a cumulative case summary State of California, Department of Corrections pertaining to the defendant are also received for the limited purpose of showing a part of the information considered by Dr. Parlour.

"Exhibits POWJ and POWN are to be considered by you as well for that limited purpose only."

they observed a 1957 Plymouth, white over orange, parked at a service station. They stopped to check out this Plymouth and determined that it was a Savoy model. While at that location they observed a 1957 Plymouth Belvedere, white over red, proceeding southbound on Freeway 99. It appeared to be occupied by a driver only. They immediately pursued this vehicle. They observed that this Plymouth was dirty and dusty and the rear license plate was shiny and clean. The license number did not coincide with that of the stolen vehicle. The traffic officers illuminated red and white spotlights and focused the white spotlight on the rear of the Plymouth, including the rear window. Odom observed the driver of the vehicle and described his conduct as follows:

"A. The left shoulder of the driver dipped down two to four inches, three or four inches; I don't know exactly.

"Q. When you say 'dipped down,' what do you mean?

"A. His left shoulder sagged down to the left (indicating)."

Both vehicles pulled to the right and came to a stop, with the police vehicle parked to the rear of the Plymouth. The officers alighted. Crist approached from the passenger side and Odom proceeded toward Powell who remained seated behind the steering wheel of the Plymouth. Powell was asked to produce his driver's license, and did so. Odom next asked for a registration for the automobile. Powell removed a yellow cashier's temporary receipt from the sun visor on the driver's side and handed it to Odom. On examination the officer observed that the name of appellant and the license plate number attached to the Plymouth checked out but that the make of the car indicated was "Ford." This discrepancy was brought to Powell's attention and he attempted to explain this away by stating he had two cars registered on the same day and "apparently I put the wrong registration on the wrong vehicle." At this point Powell was asked to step from the Plymouth to the rear of the patrol car. Odom escorted him to a place where he could be observed by Crist. Odom then reached under the front seat of the Plymouth automobile on the driver's side. He there found and recovered a .32 caliber Echeveria automatic pistol. Powell was then placed under arrest for *carrying a concealed weapon.* He was then searched and was found to be carrying another clip of ammunition, .32 caliber, and a box of .38 caliber bullets. Additional items were withdrawn from the vehicle, including a five-cell flashlight which Odom had observed when he initially approached Powell and first looked into the vehicle. This flashlight had tape wrapped around

the handle. Written on the tape was the following: "Hettinger, 10369, LAPD."

Powell contends that the admission of the .32 caliber Echeveria automatic pistol taken from the Plymouth automobile and the other articles removed from his person constitute inadmissible evidence because they are the fruit of an unlawful search and seizure. To support this theory Powell cites and relies on the case of *People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559], and its progeny: *Gallik* v. *Superior Court* (1971) 5 Cal.3d 855 [97 Cal.Rptr. 693, 489 P.2d 573]; *People* v. *Superior Court (Simon)* (1972) 7 Cal.3d 186 [101 Cal.Rptr. 837, 496 P.2d 1205]; *People* v. *McReynolds* (1973) 8 Cal.3d 655 [105 Cal.Rptr. 691, 504 P.2d 915]. These case are not applicable because they involve searches and seizures conducted following ordinary traffic violations.

Appellant was not stopped or arrested because of any traffic violation. He was stopped on the basis of reasonable cause to investigate a murder. (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 452 [30 Cal.Rptr. 18, 380 P.2d 658].) ▇▇ The relevant criterion is succinctly stated as follows:

"Circumstances short of probable cause to make an arrest justify police officers in temporarily detaining a person for questioning. (*People* v. *Mickelson,* 59 Cal.2d 448, 450-451 [30 Cal.Rptr. 18, 380 P.2d 658].) The test is whether the circumstances known to the officer are such as to indicate to a reasonable person in a like position that such a course of conduct is necessary to the proper discharge of the officer's duties." (*People* v. *Sutton* (1973) 35 Cal.App.3d 264, 269 [110 Cal.Rptr. 635].)

▇▇ The circumstances that resulted in Powell's being stopped justified the stop and the preliminary interrogation. (*Chambers* v. *Maroney* (1970) 399 U.S. 42, 49 [26 L.Ed.2d 419, 427, 90 S.Ct. 1975]; *Carroll* v. *United States* (1924) 267 U.S. 132, 158-159 [69 L.Ed. 543, 553-554, 45 S.Ct. 280, 39 A.L.R. 790]; *People* v. *Schader* (1965) 62 Cal.2d 716, 722 [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Manis* (1969) 268 Cal. App.2d 653, 664-665 [74 Cal.Rptr. 423].)

The initial search of the vehicle that occurred prior to the arrest was justified on several grounds. In the first place, the *Kiefer* case did not abrogate the "furtive conduct" doctrine.[24] Suspicious gestures coupled with other facts constitute probable cause for search. The *Kiefer* court enumerated various circumstances which may contribute to the finding of

---

[24]For a thorough discussion of subject and compendium of cases: Annot. (1972) 45 A.L.R.3d 581.

probable cause in "furtive gesture" cases. Some of those fit the facts of this case:

"A furtive gesture coupled with prior reliable information may constitute probable cause. (*People* v. *Jiminez* (1956) *supra*, 143 Cal.App.2d 671, 673 [300 P.2d 68].)" (3 Cal.3d at p. 819.)

The record is uncontradicted as to the fact that the officers had information that a vehicle resembling the one occupied by Powell had been stolen within several hours and was believed to be the escape vehicle connected with a homicide.

"A second circumstance noted in virtually each of the cited cases (with the exception of *Williams* and *Gil*) is that the confrontation took place in the nighttime." (3 Cal.3d at p. 825.)

Powell was stopped sometime between 1 a.m. and 2 a.m. The event in question occurred during the hours of darkness.

Considering every circumstance of the stop and search, we conclude that reasonable cause existed under the facts and circumstances of his case to support Odom's interpretation of Powell's body language: the furtive gesture implied that the occupant was in possession of contraband which he was endeavoring to hide. Our conclusion is further supported by the more pliant disposition permitting a search with a nonarrest detention *if* the intrusion is into an operable motor vehicle and where the suspected contraband consists of weapons. (*People* v. *Flores* (1972) 23 Cal.App.3d 23, 28 [99 Cal.Rptr. 858]; *People* v. *Baird* (1971) 18 Cal. App.3d 450, 454 [95 Cal.Rptr. 700]; *People* v. *Wigginton* (1967) 254 Cal.App.2d 321, 326 [62 Cal.Rptr. 104].)

We reject the contention that the initial search and seizure resulting in the retrieval of the .32 caliber Echeveria automatic pistol was unlawful.

In addition to the "furtive conduct" the search of the Plymouth automobile can be fully justified under another and quite legitimate doctrine: "pressing emergency." In the present case the legitimacy of the search must be analyzed with reference to all of the above enumerated circumstances not the least of which is the fact that the officers were informed of a recently committed and grave offense. In *People* v. *Terry* (1969) 70 Cal.2d 410 [77 Cal.Rptr. 460, 454 P.2d 36], the court found the search

of a car justified.[25] We recognize that the "pressing emergency" situation that justifies a search without a warrant or arrest has generally been applied to abandoned automobiles and premises. However, when the facts parallel those that surrounded the search made in this case, we do not believe there is a difference worthy of distinction.[26] The totality of these circumstances warranted the original search of the vehicle and properly resulted in appellant's arrest. There is no merit in the contention that any of the other searches were unlawful since they followed the arrest of which we approve.

## POWELL

### DIMINISHED CAPACITY

Powell claims that his diminished capacity was established as a matter of law.

Powell introduced evidence pertaining to his mental state in support of his defense of diminished capacity. It was substantially greater than the evidence offered by Smith on this issue. The trial court correctly instructed on this subject with respect to Powell's ability to form the requisite state of mind for the commission of first degree murder and to form the specific intent in support of the commission of the crime of robbery on which the felony-murder theory of the prosecution hinged.

The evidence is summarized as follows: Between the ages of six and ten Powell suffered a severe head injury rendering him unconscious for several hours; in 1963 he was subjected to a craniotomy revealing that his brain

---

[25] "'The law recognizes that fresh pursuit of a fleeing suspect who has committed a grave offense and remains dangerous to life and limb may constitute "exceptional circumstances" sufficient to justify a search without a warrant.' (*People* v. *Smith,* 63 Cal.2d 779, 797 [48 Cal.Rptr. 382, 409 P.2d 222] [cert. den., 388 U.S. 913 [18 L.Ed.2d 1353, 87 S.Ct. 2119]; rehg. den., 389 U.S. 893 [19 L.Ed.2d 211, 88 S.Ct. 13]].) A search of the car, abandoned by an individual suspected of killing a police officer within the last 20 minutes and presumably armed and in flight, would help ascertain whether its former occupant was armed and where he might be located. The pressing urgency of such determinations amply justified the search. Since the search of the car was legal, the fruits of that search were properly admitted." (70 Cal.2d at p. 424.)

[26] In cases beginning with *Carroll* v. *United States* (1924) 267 U.S. 132, 153 [69 L.Ed. 543, 551, 45 S.Ct. 280, 39 A.L.R. 790], the Supreme Court approved the thorough search of an automobile where the officer had probable cause to believe it contained contraband. The *Carroll* case retains vitality as demonstrated in *Chambers* v. *Maroney* (1970) 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975]. For an excellent discussion of this subject see Murray & Aitken, *Constitutional Limitations on Automobile Searches,* 3 Loyola L.A. L.Rev. 95.

was atrophied; an electroencephalogram examination demonstrated very apparent brain wave abnormalities; intellectually he tested as bright-normal or a little better than average (I.Q. of 116); he was characterized as an emotionally unstable personality which was translated into the current nomenclature of a "hysterical" personality; prior to and during the course of the kidnaping he ingested some alcoholic beverage. The testimony established that there may be a certain cause-and-effect relationship between cerebral atrophy and mental illness; but there is no demonstrable relationship between intelligence and brain atrophy and observable brain wave abnormalities are not peculiar to persons with psychiatric problems. Our attention has not been directed to any evidence as to the quantity of alcohol consumed or that Powell's consumption of alcohol affected his capacity to rationalize with respect to his conduct.

In fact, in cross-examination, Powell's psychiatrist conceded that Powell was capable of committing first degree murder. The record does not compel the conclusion that Powell's capacity was in fact diminished.

None of Powell's evidence on the issue of diminished capacity required the trier of fact to ignore the rather methodical conduct of appellant which immediately followed the abduction of the victims. The trier of fact was entitled to consider the evidence showing that Powell quickly formulated a plan for escape out of the County of Los Angeles and contemplated the effect of leaving the police vehicle parked in its conspicuous manner. The jury had a right to consider the deliberate pattern of first threatening the victims and then quieting them, the apparent design of retaining control and the final pronouncement of the invidious but revealing interrogatory by Powell just prior to the execution of Campbell: "We told you we were going to let you go, but have you ever heard of the Little Lindbergh Law?"

The fact that the only expert opinion was offered by appellant is not conclusive. ▆▆ Expert testimony, even if uncontradicted, is not binding on the court. (*Johnathan* v. *Shea* (1971) 19 Cal.App.3d 328, 334 [96 Cal.Rptr. 673]; *People* v. *Gentry* (1968) 257 Cal.App.2d 607, 611 [65 Cal.Rptr. 235].) ▆▆ Quite clearly, the evidence justified the instruction but it was not so compelling as to mandate the conclusion of this issue in favor of appellant. The jury was entitled to consider and weigh all of the evidence including the circumstances occurring prior to, at and following the killing and the important questions of the manner and means of execution. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942]; *People* v. *Smith* (1973) 33 Cal.App.3d 51, 62-64 [108 Cal. Rptr. 698].) The proof was sufficient to support the jury's conclusion on this issue. (*People* v. *Mulqueen* (1970) 9 Cal.App.3d 532, 544-545 [88 Cal. Rptr. 235].)

## SMITH

## DIMINISHED CAPACITY

■ The failure of the trial court to instruct the jury *sua sponte* on the defense of "diminished capacity" as to Smith was not error. He has not directed our attention to anything in the record to the effect that he was incapable of forming any of the specific mental states that are essential elements of murder and robbery. There simply was no evidence that he had a substantially reduced mental capacity caused by mental illness, intoxication or any other cause.

Smith bases his claimed right to the defense of diminished capacity on three points. First, he repeatedly refers us to portions of the transcript indicating that he had no idea or inkling that Powell intended to kill the victims. At best, this is an assertion of innocence that pivots on an alleged state of ignorance. Secondly, he argues that his participation was produced by his fear of Powell. A similar argument was rejected by the California Supreme Court in *People* v. *Terry* (1970) 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961].

Third, Smith produced Dr. Thomas J. Meyers, a physician and surgeon specializing in the practice of psychiatry. Dr. Meyers testified that he submitted Smith to a variety of tests, examinations and interviews. When called upon for his conclusions, he stated the following:

". . . In summarizing I would say that the central theme of the whole narrative of this man is one of nonviolence, going back in early years."

Dr. Meyers' characterization of Smith does not support or compel an instruction on diminished capacity.[27] Smith never offered any evidence that

---

[27]Dr. Meyers' testimony:

"Q. Is his personality, in your opinion, subject to a characterization or description?

"A: Yes. He would be a sociopathic personality with rather strong schizoid characteristics.

"Q: What does a psychopathic personality mean, doctor?

"A: A psychopathic personality, or a sociopathic individual is an individual who violates the rules. In other words, there is a matter of degree. The extreme case of a sociopathic they call amoral dementia rather than idealization, one in which the values of the majority of people to which the majority of people would adhere, he will kind of take liberties with and establish his own values which are very often at odds with society and which accounts for the fact that he gets into trouble so often.

"Q: What does schizoid mean?

"A: A schizoid individual is an individual who lives to an increasing degree within himself. Such people are relatively isolates [*sic*]. That is, they are able to find a certain degree of completion within themselves rather than in association or contact with other people. Their values are very often the motivation of their acts, come

he was incapable of premeditation or acting with malice or forming a specific intent to commit the crime of murder or robbery. It is true that he does offer evidence that he is a sociopathic personality with schizoid characteristics. That by itself only implies some emotional disturbance and does not exclude the capacity to premeditate. (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 728 [102 Cal.Rptr. 385, 497 P.2d 1121].)

## SMITH AND POWELL

### FELONY-MURDER RULE (ROBBERY) APPLICATION

 Appellants claim that the felony-murder rule is inapplicable and object to inclusion of robbery as the concomitant felony. They urge that if robbery was committed it was completed before the killing. That was a question for the jury to determine.

Cases dealing with this special theory of the "time phase" of the formation of the specific intent to rob involve acts of larceny following the killing or the infliction of the fatal injury. (*People* v. *Gonzales* (1967) 66 Cal.2d 482, 486 [58 Cal.Rptr. 361, 426 P.2d 929] [Jury was properly instructed that intent to rob subsequent to the infliction of the mortal wound was not sufficient to support a finding of first degree felony-murder rule.]; *People* v. *Jeter* (1964) 60 Cal.2d 671 [36 Cal.Rptr. 323, 388 P.2d 355]; *People* v. *Carnine* (1953) 41 Cal.2d 384 [260 P.2d 16]; *People* v. *Kerr* (1951) 37 Cal.2d 11 [229 P.2d 777] [Not a jury trial.].) In the present case the property was taken from the victims prior to the killing of Campbell and during the stream of events that constituted the kidnaping. (*People* v. *Lessard* (1962) 58 Cal.2d 447, 453 [25 Cal.Rptr. 78, 375 P.2d 46].)

Appellants place substantial emphasis on that part of the evidence that indicates that money was returned to Hettinger and that Powell said the guns would be returned. The record clearly shows that Smith took Hettinger's gun. When that weapon was taken nothing was said about returning it. Appellants' counsel argue that the weapons were taken only for the immediate protection of the kidnapers and not to permanently deprive the victims of their property. To reinforce this construction our attention is directed to Hettinger's testimony concerning Powell's representation that when the victims were released their guns would be unloaded and thrown into some bushes where they could be found after the appellants made their escape. Powell's comment was responsive to Hettinger's request that the guns be returned. Nothing proves conclusively that either appellant removed

---

from within them and condition very much what they do. There are a great many schizoids in our society."

the victims' guns from their persons with any intention of returning them. As a matter of fact, every inference is to the contrary.

In addition to the weapons, the victims' flashlights were taken. Again appellants urge that this taking was necessary for their protection. However, there was no testimony about either Powell or Smith indicating in any way that these items would be returned. Furthermore, their slight value is beside the point. (*People* v. *Simmons* (1946) 28 Cal.2d 699, 705 [172 P.2d 18].) Hettinger testified that during the ride towards Bakersfield Powell demanded his currency. Hettinger handed $9.00 to Powell. Later Powell returned it. Surely this money was not taken from Hettinger for the safety of the kidnapers. However, it was taken from Hettinger under circumstances where the interests of his safety compelled his compliance. Why the money was returned is curious. The record does not show that Powell did not intend to keep it when he first took it. In fact, it suggests a quiet confidence that it would be available in any event or even a significant degree of sophistication about the felony-murder rule. After all, Powell ultimately inquired as to what Campbell knew of the "Little Lindbergh Law." It appears that Powell gave this matter of having kidnaped Campbell and Hettinger a good deal of thought. ██ It is elementary that returning property once stolen or taken under force does not neutralize the criminal character of the original act. (*People* v. *Stephenson* (1974) 10 Cal.3d 652, 661 [111 Cal.Rptr. 556, 517 P.2d 820]; *People* v. *Tipton* (1950) 96 Cal.App.2d 840, 841 [216 P.2d 570]; *People* v. *James* (1937) 20 Cal.App.2d 88, 90 [66 P.2d 461].) ██ In this particular case it is far more likely that Powell's assurance that he would return the weapons and his return of the money were motivated by a disposition to insure the passivity of the victims until the appellants had reached a place of safety. As long as appellants were accompanied and saddled with Campbell and Hettinger they had not done so. (*People* v. *Salas* (1972) 7 Cal.3d 812, 820-824 [103 Cal.Rptr. 431, 500 P.2d 7].) The instructions with respect to robbery were proper.

## SMITH

### JURY INSTRUCTION ON THEORY OF ROBBERY-MURDER

██ Smith contends that the trial court improperly and incompletely instructed the jury on the theory of the felony-murder rule. (Pen. Code, § 189.) In particular, it is urged that the court failed to instruct the jury that it had to find that the specific intent to commit the robbery must be proved beyond a reasonable doubt. The record reveals that the court instructed the jury that specific intent was an element of the crime of robbery and that the robbery itself must be proved beyond a reasonable

doubt. Smith cites *People* v. *Sears* (1965) 62 Cal.2d 737 [44 Cal.Rptr. 330, 401 P.2d 938], for the proposition that he was entitled to a *sua sponte* instruction that the specific intent to commit the involved felony must be proved beyond a reasonable doubt. *People* v. *Sears, supra,* is not in point. That case is concerned with the question of whether or not the evidence was sufficient to warrant an instruction on felony murder mayhem. The issue raised by Smith is whether or not the instruction given was adequate. We conclude that the pertinent instructions, when read together, clearly informed the jury that it had to find the presence of a specific intent to permanently deprive the officers of their property beyond a reasonable doubt.[28] If Smith wanted a more definitive instruction it was his obligation to offer it. (*People* v. *Brunt* (1972) 24 Cal.App.3d 945, 956 [101 Cal.Rptr. 457].) We are satisfied that the instruction was adequate.

 The failure to instruct that the felony-murder rule is inapplicable if the intent to rob occurs after the homicide—a fanciful theory on the facts of this case—was not error. Smith relies on *People* v. *Carnine* (1953) 41 Cal.2d 384 [260 P.2d 16]. That case is fully distinguishable in that the accused *submitted* and *requested* the instruction. Nowhere does the court declare that the instruction must be given *sua sponte*. The facts of *Carnine* and of the present case demonstrate that where the time phase of an *element* of the offense is placed in issue by the defense it becomes a special issue or theory. The court is not obligated to instruct *sua sponte* on specific points, but only on relevant law pertaining to substantial evidentiary matter that is sufficient to inform the trier of fact that the defendant is relying thereon to avoid conviction. (*People* v. *Brunt* (1972) 24 Cal.App.3d 945, 956 [101 Cal.Rptr. 457]; *People* v. *Williams* (1971) 17 Cal.App.3d 554, 566 [95 Cal.Rptr. 234].)

POWELL

MISCONDUCT OF ATTORNEY

 The prosecutor referred to Hettinger's private life in his opening statement. In part, he said that Hettinger was married and that his wife

---

[28]The following are the instructions given by the trial court pertaining to the concomitant felony of robbery:

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which is committed in the perpetration or attempt to perpetrate robbery, the commission of which crime itself must be proved beyond a reasonable doubt, is murder of the first degree."

"To constitute robbery there must exist in the mind of the perpetrator, at the time of the taking of the property, the specific intent to permanently deprive the owner of his property."

was pregnant. The opening statement also made reference to Campbell's two young daughters. Powell cites this as prejudicial misconduct. We do not agree. The testimony of Hettinger included references to the conversations between Powell, Smith, Campbell and Hettinger. This testimony revealed the same information as to family status. On balance, the remarks objected to are relatively mild, though preferably they should have been avoided. Viewing the totality of the evidence, the proof against Powell was so persuasive that no miscarriage of justice can be found to have resulted. Therefore, we find the error, if any, slight and, beyond a reasonable doubt, not prejudicial. (Cal. Const., art. VI, § 13.)

## SMITH

### COMPETENCY OF TRIAL COUNSEL

On April 1, 1969, Smith made a motion to discharge his then trial attorney, Irving Kanarek. The motion was granted. Pursuant to Penal Code section 987, the court appointed Charles Hollopeter to represent Smith. Smith was present when the appointment was made and was informed that Hollopeter had prior commitments, including a trip out of the country during the month of May. With this information, Smith accepted the appointment of Hollopeter and agreed to a continuance of the trial to July 10, 1969. Thereafter he agreed to further continuances. On September 30, 1969, Hollopeter made a motion to be relieved as counsel, and Smith joined in the motion. The court was informed that Hollopeter's assessment of the case was different from that of Smith. Smith addressed the court and cited three points of irritation. First, he complained that Hollopeter was not immediately available to him following the appointment. Since counsel's prior commitments were made known to Smith at the time of the appointment, this complaint rings hollow. Furthermore, there is a total absence of any evidence that Smith was prejudiced because Hollopeter was not at his beck and call. The second irritant was a vague assertion concerning Hollopeter's failure to file a writ of habeas corpus that had been personally prepared by Smith. The basis for the writ was not indicated. Whether or not extraordinary writs should be applied for is a determination that generally should be left with counsel since he is in control of the case. Again, there is no showing that Smith was prejudiced by this conduct. Third and finally, Smith complained that Hollopeter had failed to follow through with an earlier application to obtain a "hypnosis truth serum test" for Smith. This last complaint appears to have been mistaken because the record shows that Smith was afforded a number of psychological examinations, including a

sodium amytal interview. The court denied the motion of Hollopeter and Smith and the case proceeded to trial on October 2, 1969, with Hollopeter as counsel for Smith.

The denial of the motion was not an abuse of discretion. At this juncture, Smith was represented by his third attorney. The record of the later trial clearly shows that Hollopeter was prepared. To the extent that this ground of appeal is predicated on a claim of error in replacing Kanarek with Hollopeter, we dismiss that contention. Smith invited the discharge of Kanarek and represented that he would accept and cooperate with any other attorney the court might appoint. It is now settled that the appointment of counsel is a choice left to the trial court. (*Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930, 934-935 [106 Cal.Rptr. 631, 506 P.2d 1007].)

██ Smith now argues that he received inadequate and ineffective representation during the course of the trial. He complains that Hollopeter erred in the following ways: 1) on *voir dire* he informed the jury panel that the defense expected a conviction of murder in the second degree; 2) during the course of trial and after the People had put in evidence that Smith was on parole, he referred to Smith's parole status; 3) he stipulated to the identity of the "Hettinger" gun; 4) he failed to move for new trial and moved for immediate sentencing without any probation report. We dismiss each of these complaints with the following explanations:

During the *voir dire* Hollopeter stated that the prosecution was asking for a verdict of murder in the first degree and that the defendant was asking for a verdict of murder in the second degree. Smith's contention is that this interrogation was tantamount to a plea of guilty. We do not agree. The fact that Smith was previously convicted of first degree murder, coupled with the overwhelming evidence against him, strongly suggested that good trial tactics demanded complete candor. At a minimum, Smith's own testimony would support a conviction of second degree murder predicated on a homicide occurring in the course of a kidnaping. The candor of counsel manifests sound trial tactics and not reversible error. (*People* v. *Reeves* (1966) 64 Cal.2d 766, 769, 773 [51 Cal.Rptr. 691, 415 P.2d 35]; *People* v. *Chasco* (1969) 276 Cal.App.2d 271, 273 [80 Cal.Rptr. 667]; *People* v. *Gibbs* (1961) 188 Cal.App.2d 596, 601 [10 Cal.Rptr. 581].) As a matter of fact, the reduction of the penalty on the second trial is a good result that speaks for itself.

██ The People referred to Smith's parole status at the time of the homicide and introduced into evidence the "parole agreements." Smith

acknowledges that trial counsel objected to both the comment and the introduction of evidence on the subject of parole. The objections were overruled. That reason by itself is sufficient justification for Hollopeter to refer to and deal with the fact of Smith's parole. Moreover, the psychiatric interview was offered in support of Smith's tendered defense of diminished capacity. This was the examination which Smith himself insisted upon having prior to the commencement of trial. Hollopeter placed the results of that examination before the jury in attempting to demonstrate that Smith was a nonviolent person and incapable of forming the requisite intents necessary to establish a conviction of murder in the first degree. Smith himself took the stand. Part of his testimony related to the circumstances under which he met Powell. This fully revealed the parole status and prior criminal activity of appellants. The combined evidence of the psychiatrist and Smith was an essential part of Smith's defense that his participation was compelled by the menacing threats of Powell. Therefore, appellant's parole status was essential to two defense theories. These references certainly do not show ineffective and inadequate counsel.

██ Smith's contention that counsel should not have stipulated to the identity of the .38 Colt six-inch barrel revolver as "Hettinger's gun" is without merit. The "Hettinger gun" was independently identified and trial counsel's stipulation was totally reasonable.

The contention that trial counsel erred by failing to make a motion for a new trial is without merit. We find no basis for such a motion in this record. Smith's suggestion that a probation report should have been obtained is vapid. Having been convicted of first degree murder, Smith was not a likely candidate for probation. Under all of the circumstances at the time of the conviction and the arraignment for sentence, it appears to us that trial counsel made a wise decision in waiving probation and moving to advance the matter for sentencing.

### SMITH

### CRUEL AND UNUSUAL PUNISHMENT

██ The contention that Smith was mistreated by the People is without merit. The thrust of this contention is that Smith was abused by his jailers and treated disrespectfully by the prosecuting attorneys to such a degree of degradation as to constitute cruel and unusual punishment. The record does not support that view. The record merely shows a justifiable concern for security. Smith's ability to defend himself was not impaired.

The treatment complained of, before and during trial, is therefore not a valid basis for a reversal of the judgment of conviction. (*State* v. *Coleman* (Mo. 1970) 460 S.W.2d 719, 728; *State* v. *Williams* (1968) 157 Conn. 114 [249 A.2d 245, 248], cert. den., 395 U.S. 927 [23 L.Ed.2d 244, 89 S.Ct. 1783].)

The judgments of conviction as to each of the appellants are affirmed in all respects except that insofar as the judgment provides for the penalty of death as to Powell, it is modified to provide a punishment of life imprisonment. (*People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880].)

Kaus, P. J., and Hastings, J., concurred.

A petition for a rehearing was denied July 22, 1974, and appellants' petitions for a hearing by the Supreme Court were denied September 5, 1974. Wright, C. J., did not participate therein.

APPENDIX

## RULE 25. SELECTION OF JURORS.

Section 1. (Manner of Selecting Prospects; No Discrimination.) Persons qualified to render the public duty of jury service shall not be excused from such service except for the causes specified by Section 201 of the Code of Civil Procedure. The Jury Commissioner shall be fair and impartial in the selection of prospective jurors; using the methods and processes under the supervision and control of the court, best suited for these purposes. No prospective juror shall be rejected because of political affiliation, religious faith, race, color, social or economic status, occupation or sex.

Section 2. (Source of Names; Method.) The names of prospective trial jurors (other than any nominated by individual judges) shall be taken from the last published and available registered voters list of Los Angeles County, and by the use of the "key number method." An estimate shall be made of the number of jurors needed to make up the list for the period required and the key numbers used by the Jury Commissioner shall be based on such estimate.

Section 3. (Data Sheet and Questionnaire Adopted.) The court adopts, for the use of the Jury Commissioner, a form of data sheet and questionnaire, the original of which bears date of February 1, 1959, and is filed as of such date in the minutes of Department 1.

Section 4. (Determining Qualifications and Excluding Prospective Jurors Not Competent.) The Jury Commissioner shall determine the statutory qualifications of each prospective juror and the existence of any infirmity which would impair due performance of jury duty. He shall exclude from service all those he shall find are not competent to serve by law.

Section 5. (Excusing Qualified Persons.) The Jury Commissioner is hereby empowered to grant excuses from jury service to such prospective jurors who in the opinion of the Jury Commissioner qualify for excuse under Section 201 of the Code of Civil Procedure. Before granting or refusing any excuse from jury service, the Jury Commissioner shall fairly weigh and consider all pertinent data, documents, and information submitted by or on behalf of the prospective juror whose excuse or excuses are being considered, and shall, whenever he deems it necessary or desirable, personally interview such prospective juror.

Section 6. (Jury Panels; Use by Municipal Court.) Any municipal court in this county may, by rule adopted by said court, use the same jury panel that is summoned for use in this court. In making up the jury list as provided for in Section 2 hereof, the Jury Commissioner shall consider the number of jurors who may be needed not only by this court but also all municipal courts electing to use the same jury panel as this court. Individual jurors shall be assigned for service in a particular division of a municipal court requesting a trial panel in the same manner in which they are assigned to the various departments of this court. [Added 11-8-67]

Section 7. (Jurors' Meal Expense. Limitations.) Jurors on criminal cases who are placed in the custody of the bailiff by the court while deliberating shall be allowed the actual cost of meals, not to exceed a maximum for each meal as shall from time to time be fixed by the Committee on Personnel and Budget. [Renumbered and revised 11-8-67]

Exhibit 1

$PT-RR$

**The Superior Court**

·LOS ANGELES, CALIFORNIA 90012

JESSE T. BERGER, EXECUTIVE OFFICER

WILLIAM A. GOODWIN
JURY COMMISSIONER

JURY DIVISION
625-3414
EXT. 61-781

271553

CASE No. ............ 
Smith ....... EXHIBIT PT-RR
ADMITTED IN EVIDENCE
Powell PT-Powell P
JAN 8 1969
WILLIAM G. SHARP, County Clerk
BY ............ DEPUTY

Notice to Appear for Examination
for Jury Duty on:

At:

If impossible to appear on the
above date you may report on any
of the following dates:

Mo.Day Mo.Day Mo.Day Mo.Day Mo.Day

Dear Citizen:

By direction of the Superior Court your name has been
drawn and included on the court list of prospective jurors.

You are hereby requested to present this letter between
the hours of 8:30 A.M. and 3:00 P.M. at the location and on the date
listed above. If you use glasses please bring them with you.

Only the reasons set forth on the reverse side of this
letter can be considered as proper for failure to appear. If you
wish to claim exemption, please comply with the instructions on
the reverse side of this letter.

You will not be summoned for actual jury service until
after 3 to 6 months from the date of examination. Ordinarily,
jury service on cases will not exceed twenty days.

Yours very truly,

William A. Goodwin
Jury Commissioner

By direction of the Court:

Donald R. Wright

Presiding Judge

271553
CASE N................ DATE AUG 9 - 1968
Smith EXHIBIT NO. ..PT-RR
FOR IDENTIFICATION ONLY
Powell

Exhibit 2 - page 1.

## INSTRUCTIONS

If you are physically unable to perform jury duty, lack supervision for your minor children, or are exempt by reason of your occupation as lawyer, physician, dentist, clergyman or pharmacist, or have served on the jury within the past two years, satisfactory completion and return by mail of the certificate on this page to the Jury Commissioner's office will excuse you from jury duty until further notice.

If you are a legal resident of Los Angeles County, but temporarily absent from the County, you may so state on this letter and return it to the Jury Commissioner for deferment. If you are no longer a legal resident of Los Angeles County, you may complete the certificate on this page and mail it to the Jury Commissioner in order that you may be excused from jury service.

STATE OF CALIFORNIA
County of Los Angeles CERTIFICATE

1. FULL NAME (MR. MRS. MISS)_____
 LAST NAME FIRST NAME

2. HOME ADDRESS_____
 NUMBER STREET ZONE CITY

3. ARE YOU A CITIZEN OF THE UNITED STATES? YES ☐ NO ☐ (CHECK ONE)

4. AGE_____ BIRTHPLACE _____
 (STATE OR NATION)

5. HAVE YOU EVER SERVED AS A JUROR IN THIS COUNTY? YES ☐ NO ☐ (CHECK ONE)
 (A) IF YOUR ANSWER IS YES, CHECK THE COURT OR COURTS IN WHICH YOU HAVE SERVED:

 FEDERAL COURT MUNICIPAL COURT
 SUPERIOR COURT JUSTICE COURT

 (B) WHEN WERE YOU LAST DISCHARGED FROM JURY SERVICE? _____

6. WHAT IS YOUR OCCUPATION, TRADE OR PROFESSION?_____

7. IF EMPLOYED, BY WHOM?_____

8. STATE NUMBER AND AGES OF MINOR CHILDREN _____

9. STATEMENT OF ADDITIONAL FACTS:

 _____
 _____
 _____
 _____
 _____

 I declare, under penalty of perjury, that the above statements are true and correct.

Exhibit 2 - page 2

_____ _____ _____
 (DATE) (CITY)

## The Superior Court
### OFFICE OF THE JURY COMMISSIONER
### LOS ANGELES COUNTY
### PROSPECTIVE JUROR EXAMINATION

*P+ -P- O*
*P+ -Smith - P J*

Full Name_____

LAST FIRST MIDDLE

Each *underlined* word on this page is followed on the same line by four other words. One of these four words means the same or nearly the same as the underlined word. *PLACE IN THE PARENTHESES TO THE RIGHT OF THIS WORD THE NUMBER OF THE COLUMN IN WHICH THE CORRECT MEANING OCCURS.* For example this sample line would be marked as follows:

| | 1 | 2 | 3 | 4 | |
|---|---|---|---|---|---|
| O attempt | run | hate | try | stop | (3) |

The correct word is in column 3. Therefore, number 3 is placed in the parentheses.

Do not omit any items. If you do not know the correct meaning, be sure to indicate which you think is the most probable one.

| | | 1 | 2 | 3 | 4 | |
|---|---|---|---|---|---|---|
| 1 | fraud | deceit | remark. | wife | flood | ( ) |
| 2 | involve | implicate | wrong | ruin | turn around | ( ) |
| 3 | credible | unbelievable | estable | estimated | believable | ( ) |
| 4 | acquit | refuse | meditate | discharge | go away | ( ) |
| 5 | plaintiff | arraignment | one who brings suit | overseer | evidence | ( ) |
| 6 | allege | assert | to own | reduce | reflect | ( ) |
| 7 | intent | application | purpose | service | extent | ( ) |
| 8 | larceny | large opening | theft | Swedish | market | ( ) |
| 9 | trustee | leader | orphan | traitor | a safe keeper | ( ) |
| 10 | ratify | select | import | approve | rate | ( ) |
| 11 | valid | highly valued | having legal force | perfect | uncertain | ( ) |
| 12 | proper | appropriate | ordinary | respectful | expert | ( ) |
| 13 | impute | prefer | impure | to ascribe or credit | prove | ( ) |
| 14 | legacy | to delegate | operation | bequest | loan | ( ) |
| 15 | assign | sign | bring into | lessen | make over to | ( ) |
| 16 | accede | donate | rise up | agree | excel | ( ) |
| 17 | expend | terminate | pay out | detest | grow longer | ( ) |
| 18 | justify | warrant | expect | to reprove | fortify | ( ) |
| 19 | immoderate | trustworthy | temporal | ashamed | to excess | ( ) |
| 20 | provoke | put together | catch | remove | to cause | ( ) |
| 21 | malice | sadness | force | unpleasant | ill will | ( ) |
| 22 | marital | judged | military | referring to marriage | reduced to rank | ( ) |
| 23 | apprehend | apprise | seize | rob | precede | ( ) |
| 24 | waive | give up | move violently | make note of | march | ( ) |
| 25 | duress | overcome | length | existence | compulsion | ( ) |

(Over)
2.

Exhibit 3 - page 1

The following two instructions are examples of those given to a jury by the judge in the trial of a case.

After these instructions are several statements, some of which are stated in the instructions or indicated by them.

Read the instructions carefully, and then indicate by a check mark in the margin opposite each of the statements whether it is True or False.

## INSTRUCTION NO. 1 — PRESUMPTION OF INNOCENCE

A defendant in a criminal action is presumed to be innocent until the contrary is proved and in case of a reasonable doubt whether his guilt is satisfactorily shown he is entitled to an acquittal. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: "It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

| | True | False |
|---|---|---|
| (a) The defendant in a criminal action is presumed to be guilty until the contrary is proved. | ( ) | ( ) |
| (b) The burden of proving the defendant guilty rests upon the State. | ( ) | ( ) |
| (c) When a juror does not feel an abiding conviction, to a moral certainty of the truth of the charge, he is said to have a reasonable doubt. | ( ) | ( ) |
| (d) Reasonable doubt is not to be based upon a comparison and consideration of all the evidence. | ( ) | ( ) |

## INSTRUCTION NO. 2 — PREPONDERANCE OF EVIDENCE AND CREDIBILITY OF WITNESS

In civil cases, a preponderance of evidence is all that is required; that is, such evidence as, when weighed with that opposed to it, has more convincing force and greater probability of truth.

You are the sole and exclusive judges of the credibility of the witnesses who have testified.

In determining the credibility of a witness you may consider any matter that has a tendency in reason to prove or disprove the truthfulness of his testimony, including but not limited to the following:

His demeanor while testifying and the manner in which he testifies; the character of his testimony; the extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies; the extent of his opportunity to perceive any matter about which he testifies; his character for honesty or veracity or their opposites; the existence or nonexistence of a bias, interest, or other motive; a statement previously made by him that is consistent with his testimony; a statement made by him that is inconsistent with any part of this testimony; the existence or nonexistence of any fact testified to by him; his attitude toward the action in which he testifies or toward the giving of testimony; his admission of untruthfulness.

| | True | False |
|---|---|---|
| (a) Evidence preponderates in a civil case if it has more convincing force than the evidence opposed to it. | ( ) | ( ) |
| (b) The jury alone is to decide whether or not the testimony of the witness is to be believed. | ( ) | ( ) |
| (c) In determining the extent to which credence is to be given to testimony, the jury is to consider, among other things, the behavior of the witness. | ( ) | ( ) |
| (d) No consideration is to be given to the interest a witness may have in the outcome of the case. | | |

Exhibit 3 — Page 2

76J852—J0029R9-01— CUB 4-68